Andrew F. Pierce, Esq. (State Bar No. 101889)
Stacy North, Esq. (State Bar No. 219034)
PIERCE & SHEARER LLP
2483 E. Bayshore Road, Suite 202
Palo Alto, CA 94303
Phone (650) 843-1900
Fax   (650) 843-1999
Email: apierce@pierceshearer.com
       stacy@pierceshearer.com

Attorneys for Plaintiff Joseph Ciampi

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

(SAN JOSE DIVISION)

| | |
|---|---|
| JOSEPH CIAMPI,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PALO ALTO, a government entity; LYNNE JOHNSON, an individual; CHIEF DENNIS BURNS, an individual; OFFICER KELLY BURGER, an individual; OFFICER MANUEL TEMORES, an individual; OFFICER APRIL WAGNER, an individual; AGENT DAN RYAN; SERGEANT NATASHA POWERS, an individual.<br><br>Defendants. | Case No. C 09 02655 JF<br><br>**CIAMPI'S LETTER IN BRIEF AND DECLARATION OF JOSEPH CIAMPI IN RESPONSE TO NOTICE AND APPLICATION FOR ORDER PERMITTING PIERCE & SHEARER, LLP TO WITHDRAW AS COUNSEL OF RECORD AND REQUEST FOR CONTINUANCE OF TRIAL DATE AND ALL RELATED DEADLINES**<br><br>[Civil L.R. 11-5]<br>[Civil L.R. 7-11]<br><br>Judge: The Honorable Judge Fogel |

I Joseph Ciampi, hereby declare as follows:

1. TO EACH PARTY AND THEIR COUNSEL OF RECORD: YOU ARE HEREBY NOTIFIED OF Plaintiff Joseph Ciampi's, (Ciampi), response to Ciampi's Counsel of Record

1   Pierce & Shearer, LLP; Attorney Stacy North, (North), and Attorney Andrew F. Pierce's Motion
2   to Withdraw as Counsel of Record.
3       2. Ciampi concurs with North and Pierce and requests that this Court issue an Order
4   relieving Pierce & Shearer as Counsel of Record for Ciampi in this action.  Ciampi disputes the
5   justifications cited by North and Pierce for granting the motion and therefore Ciampi has
6   provided his own justifications as to why the motion for withdraw should be granted.   Ciampi
7   further respectfully requests a continuation of the trial date and all related deadlines by at least
8   six-months in order to provide Ciampi time to obtain new counsel.  As such Ciampi requests that
9   all papers and documents be served on current counsel or the Clerk of the Court until such time
10  that Ciampi obtains new counsel **[Civil L.R. 11-5(b)]**.  Should Ciampi not obtain new counsel in
11  six months, Ciampi will enter a motion to appear in *pro se.*
12      3. All exhibits can be provided upon request and or in an *in camera* hearing.

**One:**

    4. In response to Ciampi's inquiries, on March 12, 2010 Attorney Stacy North stated to Ciampi that all of the Taser cameras had been requested for inspection (Exhibit A). There are three Taser cameras documented as containing the videos of the incident.  Mrs. North only requested the inspection of two cameras.  She did not request the inspection of Taser camera SN# V07-065373.

    5. In response to Ciampi's inquiry as to whether Forensic Expert Gregg Stutchman was informed of the third Taser camera and had been provided the 2008 Taser Download Report documenting the existence of the third Taser camera, Attorney Andy Pierce stated to Ciampi on March 23, 2010 that Forensic Expert Gregg Stutchman was given the data that he and North were given by the defendants (Exhibit B).    Staff from Gregg Stutchman's Lab have stated that

Stutchman was not informed of the third Taser camera and was not provided the 2008 Taser Download Report that documents the existence of the third Taser camera (Exhibit C).

(Gregg Stutchman's Contact Information:

Stutchman Forensic Laboratory

Audio and Video Forensics

Forensic Photography

421 Walnut St. Suite 120

Napa, CA 94559

(707) 257-0828 or (800) 799-0828)

6. On February 12, 2010 Attorneys Stacy North and Andy Pierce provided their client Joseph Ciampi with Palo Alto Police Department's Taser Download Report 2008 which specifies that Officer Burger's Taser camera identified as SN# V07-065373, (Exhibit D) a supplemental statement in Ciampi's file, (08-1777), made by Police Chief Dennis Burns asserting that he took possession of Burger's Taser camera (Exhibit E) and Santa Clara County Crime Lab's examination report M081017(Exhibit F) in which analyst John Bourke specifies that he analyzed the video on Burger's Taser camera identified as SN# V06-015542 (Exhibit F).

7. It is clear that based upon these two different serial numbers representing Burger's Taser camera that Burger's Taser video of the incident was recorded on one camera and then placed on a second camera which was delivered to the crime lab for analysis (Exhibit G). The videos examined by the crime lab were created on ASF files which as Forensic expert Gregg Stutchman pointed out in his August 2008 analysis are not the original videos (page 6 of Exhibit H). Taser videos are created on MPEG4 files (Exhibit I and I-2). The above information is a

very significant and critical piece of evidence having the ability to help prove the most serious allegation and cause of action listed in Ciampi's complaint.

8. It is reasonable to conclude that Burger's Taser camera SN# V07-065373 contains the original unadulterated video of the incident which will one, verify Ciampi's account of the events and two empirically prove that personnel from the Palo Alto Police Department provided edited, altered and falsified videos to the District Attorney in order to wrongfully and falsely incriminate Ciampi of a crime.

9. On Februray 15, 2010 Ciampi informed North and Pierce of the third Taser camera. On February 16, 2010 and several times there after Ciampi requested that North an Pierce demand that the defendants produce all three Taser cameras for inspection and analysis (Exhibit J)

10. North refused to confirm with Ciampi that she would demand production of the third Taser camera and stated on March 12, 2010 (Exhibit A) that she already requested the Taser cameras. It becomes evident that she did request Temores' Taser camera V06-15530 and Burger's Taser camera V06-015542 but she did not request Burger's original Taser camera V07-065373 that recorded the incident.

11. North stated that she will rely on Forensic Expert Gregg Stutchman to provide her a list of materials and devices that need to be requested from the defendants (Exhibit K). Thus, North was relying on Stutchman to ask for the third Taser camera SN# V07-065373.

12. Ciampi asked both North and Pierce if Stutchman was informed of the third Taser camera and provided with the documents verifying the existence of the third Taser camera (Exhibit J).

---

4
CIAMPI'S LETTER IN BRIEF AND DECLARATION OF JOSEPH CIAMPI

C 09 02655 JF

13. North and Pierce refused to answer Ciampi's question as to whether Stutchman was informed of the third Taser camera and subsequently Pierce stated that he did not know if Stutchman was informed of the third Taser camera (Exhibit B).

14. North and Pierce both assert that Stutchman was provided all of the documents inferring that Stutchman had the information containing the verification of the third Taser camera SN# V07-065373 (Page 2 Lines 24-28 & Page 3 Lines 1-3 of Pierce's Declaration for Motion to Withdraw and (Exhibit K).

15. Subsequently, Staff from Stutchman's office stated that Stutchman was not informed of the existence of the third Taser camera by North or Pierce and that Stutchman was not provided the Palo Alto Police Department 2008 Taser Download Report containing the evidence of the existence of the third, original, Taser camera SN# V07-065373 (Exhibit C).

16. On or about November 2, 2009 after the only direct conversation that Ciampi has ever had with Stutchman, Ciampi was eager to provide and Stutchman was eager to receive Ciampi's rough analysis of the videos, however North failed to arrange a meeting with Stutchman even though Ciampi was willing to travel to Stutchman's Lab in Napa, Ca. to provide Stutchman with the evidence. This was probably due to the fact that North did not retain Stutchman until February 23, 2010 three and half months after informing Ciampi that Ciampi should provide his evidence to Stutchman verbally instead of in writing/documents as Ciampi had intended to do (Exhibit L). For North to instruct Ciampi to provide Ciampi's analysis to Stutchman directly when she had not retained Stutchman and only did so three months later is misleading. Had North retained Stutchman in November and allowed Ciampi to go over his evidence with Stutchman at that time and had North obtained the verification software from Kustom Signals to analyze the watermark on the copies of the MAV videos provided by the

defendants it is likely that it would have been unnecessary to continue the initial mediation hearing (Exhibit O).

17. Once it became apparent to Ciampi that North was preventing Ciampi from informing Stutchman of the existence of the third Taser camera Ciampi demanded a meeting with Stutchman. North agreed to set up a meeting with Stutchman just prior to going into the police station and instructed Ciampi not to point to any specific problems with the videos and evidence but to stick to general impressions (Exhibit M). This corroborates the fact that Stutchman was not provided much information in regards to the editing flaws and other discrepancies in the videos nor did North and Pierce want Ciampi to provide Stutchman with this information which is a contradiction of Pierce's assertion that the evidence was reviewed with Stutchman in great detail. As a result of North and Pierce stating to Ciampi that they would be withdrawing, Ciampi has sent Stutchman Ciampi's analysis of the videos in hopes that Stutchman's favorable opinion will be helpful in obtaining a new attorney (Exhibit N).

18. Even if Ciampi were to inform Stutchman of the third Taser camera at a meeting just prior to Stutchman going into the police station, that would be significantly too late as the defendants would require being asked to produce the third Taser camera or subpoenaed well in advance, many days or weeks, of Stutchman going into the police station in order to ensure that the defendants would produce all three Taser cameras including Taser camera SN# V07-065373 in time for Stutchman to inspect.

19. In a email sent from Pierce to Ciampi on March 23, 2010, (Exhibit B), Pierce asserts that Ciampi just had a lengthy telephone conversation with Stutchman insinuating that Ciampi could have informed Stutchman of the third Taser camera during this conversation. Ciampi had only one conversation with Stutchman on October 30, 2009, in which North participated, three and half months prior to receiving the documents verifying the existence of the third Taser

---
6
CIAMPI'S LETTER IN BRIEF AND DECLARATION OF JOSEPH CIAMPI

C 09 02655 JF

camera and five months prior to Pierce's statement, thus there was no information about the Third Taser camera to provide to Stutchman at the time that Ciampi spoke to Stutchman on October 30, 2009.

20. Heading the direction of North, Ciampi made no attempt to have and had no contact with Stutchman from October 30, 2009 until March 29, 2010 when Ciampi inquired if Stutchman was informed of the third Taser camera.

21. North and Pierce assert that Discovery remained opened for many more months, however Stutchman, who has been a forensic expert for a long time, made it clear that we would only get one shot at going into the police station.

22. If Stutchman did not know to ask for the third Taser camera and we did not obtain the production of the third Taser camera by the defendants in time for Stutchman to inspect, view, analyze and copy the video from the third Taser camera, it is highly unlikely that we would have been provided a second opportunity to go into the police station to conduct the inspection.

23. Stutchman would probably cost around $2,000.00 to go into the police station, by delaying to inspect the third Taser camera on another day would cost a second day's work of $2,000.00 to go into the police station to inspect the third Taser unnecessarily as it could have been accomplished on the one day Stutchman inspected and analyzed all of the other evidence?

24. Why pay $4,000.00 when you only need to pay $2,000.00?

25. Not conducting an inspection of the third Taser camera on the first time Stutchman goes into the police station is not an efficient use of funds and time, and is illogical procedurally. The net result of not informing Stutchman of the third Taser camera and the video that is contained on that camera is that we never would have obtained the video on the third Taser camera or the ability to inspect and analyze the contents of the third Taser camera.

26. North and Pierce never directly state that they will not request production of and or subpoena the third Taser camera, however they never state that they will either. The actions of North and Pierce clearly and convincingly verify their attempt to suppress and or delay the production of the third Taser camera SN# V07-065373.

Two:

27. On or about April 13/14, 2009 Pierce stated to Ciampi over the phone at approximately 3:30 pm in the afternoon that Ciampi's case was worth $1,000,000.00. On or about October 28, 2009 Pierce stated to Ciampi over the phone at approximately 3:00 pm that Pierce would like Ciampi to settle for $30,000.00. The above assertion is corroborated by the fact that Ciampi referred to the million-dollar amount in two separate emails sent to Pierce, one on December 1, 2009 and the other sent on January 23, 2010. Pierce did not dispute Ciampi's assertion on either occasion including the later when Ciampi refers to the $30,000.00 amount (Exhibit P).

28. What changed between April and October to cause Pierce to believe that Ciampi's case decreased in value by 97%? Why would Pierce state that Ciampi's case is worth a million dollars and then six months later state that is only worth $30,000.00?

Three:

29. On October 14, 2009 North instructed Ciampi to forward every piece of evidence and document to her, Pierce and Shearer, as well as a list every potential witness. Ciampi systematically began to send North, Pierce and Shearer, every piece of evidence and document related to the case as well as information supporting Ciampi's allegation that IPA Michael Gennaco and possibly District Attorney Staff are involved in the Civil Rights violation perpetrated against Ciampi. Apparently, Pierce was not pleased with all of the information and

blocked Ciampi's primary email account from sending emails to anyone at Pierce and Shearer on January 11, 2010 (Exhibit Q).

Four:

30. As a result of the friction over obtaining the third Taser camera, on March 23 2010 Pierce stated to Ciampi in an email that Ciampi needed new representation for the first time and provided Ciampi with a list of attorneys. Ciampi felt abandoned by his attorneys at a most critical stage knowing that his chances of finding new representation will be slim to none and Ciampi let his frustration over this be known. On March 25, 2010 Ciampi made a proposal to Pierce to help Ciampi continue his case and obtain a new attorney at the same time. Pierce responded by stating he would work something out if he can and that he would be willing to help facilitate bringing in new councel as that would be the best way to transition the representation of the case. Pierce also stated that he would move for a unilateral withdrawal if necessary. Before Ciampi replied directly to Pierce's email, Ciampi sent off an inquiry to a law firm seeking representation for Ciampi's Federal Complaint forty-six minutes after Pierce just stated he would help facilitate a transfer of representation from himself to new attorneys. Ciampi copied Pierce in on the email-inquiry too help facilitate dialog between the potential attorneys and Pierce. Pierce blocked Ciampi's email-inquiry to the law firm and therefore Pierce did not receive the information initially. Pierce continued to block Ciampi's primary email for three days. Pierce was hindering Ciampi's ability obtain new councel (Exhibit R).

31. On March 27, 2010 Ciampi emailed attorney Aram James who referred Ciampi to Pierce in which Ciampi referred to Pierce as a fraud four days after Pierce stated that Ciampi needed new representation and two days after Pierce blocked Ciampi's email and stated he would initiate a unilateral withdraw as attorneys. Pierce had already made it clear that he was withdrawing as Ciampi's attorney prior to Ciampi referring to Pierce as a fraud, therefore Pierce

cannot use this description whether accurate or not as a justification to withdraw as Ciampi's attorney. With that said, most of the so called hostility that North and Pierce cite as justification for withdraw occurred after they stated they were going to withdraw as attorneys and therefore cannot be used as justification to withdraw. In addition, Ciampi disputes the term "hostility" being used by North and Pierce as being misleading and inaccurate as Ciampi has never wished ill will upon either attorney. Ciampi has simply voiced his frustration at the misrepresented and negligent handling of his case.

Five:

32. On June, 10 2009 Pierce and Ciampi entered into an agreement in which Pierce would represent Ciampi in claims against the City of Palo Alto and employees of the Palo Alto Police Department, Michael Gennaco and the Office of Independent Review and Santa Clara County and employees of Santa Clara County District Attorney's Office (Exhibit T). On page 2 lines 12-15 within this agreement the agreement states that Ciampi has the right to settle or not to settle with the defendants. As such, Pierce cannot use any dispute about settling with the defendants as justification to withdraw from representing Ciampi.

33. On or about Aril 10, 2009 Ciampi provided North and Pierce with a copy of Ciampi's claim filed with the City of Palo Alto. This claim outlines Ciampi's settlement offer and depicts Ciampi's ideas on possible injunctions against the Palo Alto Police Department (Exhibit S). North and Pierce had possession of this document for two months prior to Ciampi and Pierce signing the Fee Agreement on June 2, 2009. In a meeting with North and Pierce on or about April 22, 2009 Ciampi made it clear like he did with every attorney that he was not interested in settling with the defendants without obtaining the original unadulterated videos and wanted to do everything possible to obtain the original unadulterated videos and reveal the fact that the videos provided to the District Attorney had been falsified in order to wrongfully

incriminate Ciampi of a crime. Prior to signing the Fee Agreement to represent Ciampi, Pierce knew that Ciampi was not interested in settling with the clients and therefore cannot use any dispute about settling as a justification for withdrawing from representing Ciampi.

34. In fact, Ciampi would like to place the recovery of the original video files from the hard drives including the third Taser camera as a part of the damages sought from the defendants should a jury rule in Ciampi's favor. Once Pierce stated to Ciampi that Ciampi should settle for $30,000.00 Ciampi began to push the amount sought so high as to ensure that Pierce completely understood what Ciampi had stated in April, that Ciampi has no intention of settling without the original unadulterated videos. In addition Ciampi would reference similar cases of evidence tampering, obstruction of justice and malicious prosecution such as Durham North Carolina District Attorney Mike Nifong losing a $180,000,000.00 judgment to Duke lacrosse players for withholding exculpatory evidence while prosecuting them for a crime they did not commit (Exhibit Z-6).

Six:

35. On June, 10 2009 Pierce and Ciampi entered into an agreement in which Pierce would represent Ciampi in claims against the City of Palo Alto and employees of the Palo Alto Police Department, Michael Gennaco and the Office of Independent Review and Santa Clara County and employees of Santa Clara County District Attorney's Office (Exhibit T). Ciampi actually had Pierce amend the initial Fee Agreement to include the County, the District Attorney and Michael Gennaco as it is believed that personnel under the supervision and direction of the District Attorney's Office as well as Independent Police Auditor Michael Gennaco violated Ciampi's Civil Rights by knowingly concealing the crimes of the culpable officers from the Palo Alto Police Department, specifically the crime of editing and falsifying the videos and other technical data.

36. From the moment of signing the Fee Agreement, Pierce has not been interested in the evidence pointing to the culpability of personnel from the Santa Clara County Crime Lab and IPA Michael Gennaco.

37. Based upon Santa Clara County Crime Lab Analysts John Bourke's and Mario Soto's examinations (Exhibit F and Exhibit U) of the Burger's and Temores' Taser guns and Taser cameras they did not do a complete analysis nor did they refute Stutchman's initial analysis. Thousands of police departments have Taser guns and every Taser gun has a Data Port that documents the duration of the activation of the Taser gun. Bourke and Soto apparently do not download the Data Ports directly to compare the activation data with the Taser camera videos to see if there are discrepancies. Burger's Taser gun activation report states that he discharged electricity for two seconds however there is evidence that he discharged electricity for as long as seventeen seconds. It is believed that when and if Burger's actual Taser gun Data Port is downloaded directly it will reveal that Burger discharged electricity for over twenty seconds and possibly as long as thirty seconds (Exhibit V). Forensic Expert Gregg Stutchman documents that both Taser videos jump in time two separate times (Exhibit H). Both Taser Gun/Camera Deployment and Activation Report provided to the District Attorney state that there was only one continuous recording on both Taser cameras contradicting the jumps in time (Exhibit V). Stutchman also pointed out that the Taser videos were created on ASF files and not the original MPEG4 files. Bourke and Soto do not refute Stutchman's findings. It should be noted that Analyst Soto was involved in another case in which he conducted an incomplete analysis which may have led to the conviction of an innocent person (Exhibit U-1).

38. Deputy District Attorney Javier Alcala did not show Judge Thang Barrett, who presided over Ciampi's Pre-Trial Hearing, any of the videos that documented the incident however Alcala allowed Palo Alto Daily News reporter Will Oremus to view one of the videos

prior to Judge Barrett making his ruling on December 17, 2008 (Exhibit Z) (Exhibit Z-4). Why would Alcala show a reporter one of the videos and not show it to the Judge? Soto's analysis of the videos was completed on November 19, 2008 ten days prior to the Pre-Trial Hearing beginning on December 1, 2008 and completing on December 17, 2008.

39. Further more, Ciampi has complained and alleged from the first moment of viewing Temores' MAV video on or about April 29, 2008 that Temores' MAV video has been professionally edited and altered having significant portions of the content removed. Ciampi informed Palo Alto's Independent Police Auditor on or about May 13, 2008 of Temores' falsified MAV video and informed the District Attorney shortly there after in May of 2008 and followed up in June 2008 and again in September 2008. There is a digital watermark on the MAV video that can be analyzed to prove or disprove Ciampi's allegation. The Santa Clara County District Attorney's office refuses to analyze this watermark and or refuses to provide the results of analyzing this watermark (Exhibit Z-5).

40. IPA Michael Gennaco states in his report regarding Ciampi's incident that he reviewed the police reports, videos and Court transcript and stated that there were no contradictions (Exhibit W-1 and W-2). Gennaco also states that the jumps in time, the gaps in time, are a result of switching modes.

41. A jump in time indicates that the Taser camera was turned off. The first problem is that in one of the jumps in time, the Taser camera continues to record video footage.

42. Burger's and Temores' Taser gun/camera deployment and activation reports contradict Burger's and Temores' Taser camera videos. There are two jumps in the time stamp on the Taser videos and the Data File report states that there is only one continuous video for each Taser camera.

43. Pages 53 and 54 of the Pre-Trial Transcript Officer Temores states that he Tasered Ciampi two separate times, however Temores' activation report states that Temores discharged electricity only one time (Exhibit Z-2).

44. Pages 92 and 93 of the Pre-Trial Transcript Officer Burger states that he placed his Taser gun back in his holster prior to firing his Taser probes after he initially drew his Taser gun however the video from his Taser camera records footage of the scene continuously from the moment Burger first draws and deploys his Taser gun up to and beyond the point at which Burger discharges the probes from the Taser gun (Exhibit X) (.Exhibit Z-3).

45. There are many more discrepancies, contradictions and flaws that can point to the culpability of Soto, Bourke and Gennaco concealing the unlawful acts of personnel from the Palo Alto Police Department.

Seven:

46. Ciampi was willing to sign the Substitution of Attorney Motion had a continuation been included as it is in the Motion to Withdraw, however North and Pierce could not provide a continuation with the Substitution of Attorney Motion (Exhibit Y).

**Conclusion**

47. In light of the foregoing, Ciampi requests that this Court issue an Order relieving Pierce & Shearer as Counsel of Record for Ciampi in this action. Ciampi further respectfully requests a continuation of the trial date and all related deadlines by at least six-months in order to provide Ciampi time to obtain new counsel. As such Ciampi requests that all papers and documents be served on current counsel or the Clerk of the Court until such time that Ciampi obtains new counsel [**Civil L.R. 11-5(b)**]. Should Ciampi not obtain new counsel in six months, Ciampi will enter a motion to appear in *pro se*.

48. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 21st day of April in Palo Alto, California.

Plaintiff

Dated: April 21, 2010

*Joseph Ciampi*

Plaintiff JOSEPH CIAMPI