UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| JOSEPH CIAMPI, | ) | Case No.: 09-CV-02655-LHK |
| Plaintiff, | ) ) ) | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' |
| v. | ) ) | MOTION FOR SUMMARY JUDGMENT |
| CITY OF PALO ALTO, a government entity; LYNNE JOHNSON, an individual; CHIEF DENNIS BURNS, an individual; OFFICER KELLY BURGER, an individual; OFFICER MANUEL TEMORES, an individual; OFFICER APRIL WAGNER, an individual; AGENT DAN RYAN; SERGEANT NATASHA POWERS, individual, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

Plaintiff Joseph Ciampi, proceeding *pro se*, brings the instant action against the City of Palo Alto and current and former employees of the Palo Alto Police Department. Plaintiff's claims arise out of an incident on March 15, 2008 that resulted in Plaintiff's arrest and the use of Taser guns against him. The criminal charges against Plaintiff were dismissed, and Plaintiff now seeks redress for alleged violations of his Fourth and Fourteenth Amendment rights, as well as violations of state law. The action is before the Court on Defendants' motion for summary judgment. The Court held oral argument on April 21, 2011.

Having considered the arguments and submissions of the parties, the Court GRANTS in part and DENIES in part Defendants' motion for summary judgment. Specifically, the Court GRANTS summary adjudication in favor of Defendants on the following claims: (1) first cause of action under 42 U.S.C. § 1983; (2) fifth cause of action for defamation; (3) sixth cause of action for malicious prosecution; and (4) seventh cause of action for false imprisonment and false arrest. The

1

United States District Court
For the Northern District of California

1  Court DENIES summary adjudication on the following claims: (2) second cause of action for

2  assault and battery; (3) third cause of action for intentional infliction of emotional distress; and (4)

3  fourth cause of action for negligence.

4  **I.  Background**

5     **A.  The March 15, 2008 Incident**

6          This case arises out of an incident that occurred on March 15, 2008, in which officers of the

7  Palo Alto Police Department used Taser guns to subdue and arrest Plaintiff Joseph Ciampi.  On the

8  morning of March 15, 2008, Plaintiff was sleeping in his vehicle, a 1985 Dodge Ram van, which

9  was parked on Lincoln Street in a residential neighborhood of Palo Alto, California.  Second

10  Amended Complaint ("SAC") ¶ 14.  Plaintiff claims that he had been parking his vehicle on

11  Lincoln Avenue and neighboring streets on and off for nearly ten years.  Decl. of Joseph Ciampi in

12  Supp. of Pl.'s Opp'n to Defs.' Mot. for Summary Judgment ("Ciampi Decl.") ¶ 63.  That morning,

13  Palo Alto resident Ken Alsman called the Palo Alto police to complain about a man living in a van

14  outside his house.  SAC ¶ 15; Decl. of Steven Al. Sherman in Supp. of Defs.'s Mot. for Summary

15  Judgment ("Sherman Decl."), Ex. 18.  Defendants have submitted a recording of the 911 call Mr.

16  Alsman made to the Palo Alto police dispatch, Sherman Decl. ¶ 21 & Ex. 18, and Plaintiff also

17  provides a transcript of the call, which conforms to the recording provided by Defendants.[1]  Ciampi

18  Decl. Ex. 548-2 – 548-5.  On the call, Mr. Alsman stated that a man, acknowledged by all parties to

19  be Plaintiff, had been parking and living on the street outside his house and "scares the daylights

20  out of [Mr. Alsman's] wife."  Sherman Decl. Ex. 18.  Mr. Alsman acknowledged that Plaintiff had

21  never threatened his wife, but stated that he scares his wife and that "it's sort of a veiled threat . . .

22  he's out there all the time."  *Id.*  Mr. Alsman also stated that his wife was coming back from

23  vacation, and his young daughter was coming back from school, and he did not want Plaintiff to be

24  there when they returned.  *Id.*  The dispatcher advised Mr. Alsman that there was no law against

---

[1] Defendants object to the transcript provided by Plaintiff on grounds that it is hearsay.  The Court relies upon the actual recording provided by Defendants, rather than the transcript provided by Plaintiff, but simply notes that based upon the transcript submitted, Plaintiff and Defendants appear to agree upon the contents of the 911 call.

Case No.: 09-CV-02655-LHK
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1   living in a vehicle, but stated that "we'll check it out."  *Id.*  The parties appear to agree that Plaintiff

2   was not violating any laws by sleeping or living in his parked vehicle.

3          At approximately 10:07 a.m. on March 15, 2008, Defendant Police Officers Manuel

4   Temores and Kelly Burger were dispatched to Lincoln Street based on Mr. Alsman's report.  Palo

5   Alto Police Department Report 08-1777 (including reports by Officers Temores, Wagner, and

6   Burger), Sherman Decl. Ex. 2 at 29, 38.  Defendant Police Officer April Wagner also responded to

7   the call.  *Id.* at 33.  Defendant Temores arrived at the scene first, followed by Defendant Wagner.

8   *Id.* at 33, 38.  At the location identified by Mr. Alsman, Temores and Wagner saw a blue van with

9   windows that were "boarded up" with cardboard or "blackened."  *Id.* at 29, 33.  Temores and

10  Wagner approached the van and knocked on its exterior.  *Id.* at 29, 33.  Their reports of the incident

11  conflict as to whether they heard a response from inside the van, but they agree that after knocking,

12  Defendant Wagner opened the van's side door, which she claims was unlocked and partially open.

13  *Id.* at 29, 33.  Plaintiff claims that he was asleep and wearing earplugs at the time, and that he was

14  awakened by a noise outside the van.  Ciampi Decl. ¶ 65.  He claims that before he could identify

15  the noise, an unknown person began to open the door to his van.  *Id.*  Startled, he shut and locked

16  the door.  *Id.*

17         After Plaintiff shut the van door, Defendants Wagner and Temores explained that they just

18  needed to speak with him and told him to open the door so they could talk to him.  Sherman Decl.

19  Ex. 2 at 29, 33; Ciampi Decl. ¶ 65.  Plaintiff told the police officers that he did not want to talk to

20  them and remained in the van with the door closed and locked.  Sherman Decl. Ex. 2 at 29, 33;

21  Ciampi Decl. ¶ 65.  Eventually, Defendant Temores "used a bluff" to induce Plaintiff to exit the

22  van.  Sherman Decl. Ex. 2 at 29.  He first informed Plaintiff that they intended to tow his vehicle

23  for overnight parking and then pretended to use his radio to ask dispatch to send out a tow truck.

24  *Id.* at 29, 33.  This induced Plaintiff to open the door and exit the van, barefoot and wearing only a

25  T-shirt and shorts.  *Id.* at 29, 33; Ciampi Decl. at 66-67.  In their reports on the incident,

26  Defendants Temores and Wagner state that Ciampi was very angry when he exited the van and

27  came out screaming at them.  Sherman Decl. at 29, 33.  Plaintiff acknowledges that he was "upset"

28  and "agitated" because he believed (apparently correctly) that he was not violating any law and had

**United States District Court**
For the Northern District of California

1   the right to refuse to speak with the police.  Ciampi Decl.  ¶ 65-66.  Once he exited the vehicle,

2   Plaintiff demanded to know what ordinance he was accused of violating and why Defendants

3   intended to tow his vehicle.  Ciampi Decl. ¶¶ 66-67.  Defendant Wagner's report characterizes

4   Plaintiff's behavior as "verbally abusive and argumentative" and states that he was "completely

5   uncooperative and used angry words."  Sherman Decl. at 33.  Defendant Temores's report states

6   that he "felt scared and threatened by the way [Plaintiff] exited the van in such an explosive

7   manner."  *Id.* at 29.

8         Shortly after Plaintiff exited the van, Defendant Burger arrived on the scene.  In his report,

9   Burger states that when he exited his patrol car, he heard a man using profanity and raising his

10  voice.  Sherman Decl. Ex. 2 at 38.  Burger's report also states that when he arrived at the van,

11  Plaintiff appeared very upset, and his fists were clenched.  *Id.*  Around that time, Defendant Burger

12  commented that Plaintiff was likely under the influence of drugs.  *Id.* at 33.  The Defendants'

13  reports state that they observed "pock marks" or abscesses on Plaintiff's arms similar to those

14  associated with heroin addicts and other persons who use intravenous drugs.  *Id.* at 30, 33, 38.  The

15  police reports also state that Plaintiff's pupils were either dilated or constricted.  *See id.* at 30

16  (Temores report stating that Plaintiff's pupils were dilated); *id.* at 38 (Burger report stating that

17  Plaintiff's pupils were constricted to 3.0-1.5 millimeters).  Based on these observations, as well as

18  Plaintiff's agitation, Defendants state that they believed Plaintiff was likely under the influence of a

19  controlled substance.  *Id.* at 30, 33, 38.  Indeed, Plaintiff states that Defendant Temores accused

20  him of being a heroin addict, and that Plaintiff vehemently denied the accusation. Ciampi Decl.

21  ¶ 68; SAC ¶ 25; *see also* Sherman Decl. Ex. 15 at 10:10:06-08 (MAV recording in which a voice

22  says, "Are you a heroin addict or what?").  Plaintiff acknowledges that he has a skin condition that

23  causes sores on his skin, but claims that the sores were on the tops of his arms, not on his veins.[2]

24  Ciampi Decl. ¶ 68.  Plaintiff states that he pointed this out to Defendants at the time, explaining

25

26  _____

    [2] It is undisputed that Plaintiff has a skin condition that causes sores on his skin.  No party currently
27  contends that Plaintiff is a heroin addict or unlawfully uses controlled substances.  However,
    Defendants' actions must be judged based upon the reasonableness of their actions in light of the
28  facts and circumstances confronting them at the time, without the benefit of "the 20/20 vision of
    hindsight."  *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).

Case No.: 09-CV-02655-LHK
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    that "drug users don't shoot into the tops of their arms, they shoot into their veins."  Ciampi Decl.

2    ¶ 68; Sherman Decl. Ex. 15 at 10:10:07-14.  Plaintiff also claims that at some point around this

3    time, he heard Defendant Burger say that Plaintiff was under arrest.  *Id.* ¶ 69.  Plaintiff did not

4    know for what he was being arrested.  *Id.*  At this point, the situation quickly escalated, and

5    Plaintiff and Defendants provide somewhat differing accounts of what occurred.

6              **B.  Defendants' Account of the Use of Force**

7              According to the Defendants, at some point, either after Burger used the term "550" (short

8    for Health and Safety Code § 11550(a), being under the influence of a controlled substance) or

9    after Burger asked Plaintiff to step away from the van door, Plaintiff jumped back into the van.

10   Sherman Decl. Ex. 2 at 30, 33, 38.  This concerned the Defendants because the van was unsecured,

11   and they did not know whether Plaintiff had a weapon accessible.  *Id.* at 30, 38.  Defendant Burger

12   told Plaintiff to exit the van, but Plaintiff instead starting making a call on his cell phone.  *Id.* at 30,

13   33.  When Plaintiff remained in the van, Defendants Burger and Temores activated their Tasers and

14   pointed them at Plaintiff's chest.  *Id.* at 30, 38.  Although Burger warned Plaintiff that they would

15   deploy their Tasers if he did not come out of the van, Plaintiff refused to come out and told them

16   that he was calling his lawyer.  *Id.* at 30, 38.  Plaintiff then scooted toward the door of the van, put

17   his feet on the pavement, and picked up a two-liter plastic soda bottle partially filled with a liquid.

18   *Id.* at 30, 33, 38.  Defendant Temores claims that he "immediately thought the 2-liter of soda could

19   be a dry-ice bomb which could be used as a weapon against us."  *Id.* at 30.

20             Defendant Burger then pulled Plaintiff from the van and moved him against a residential

21   fence.[3]  Defendant Temores states that Burger attempted to grab Plaintiff's arms, but Plaintiff

22   flailed his arms at Burger.  *Id.*  Temores then "yelled to Officer Burger to deploy his Taser"

23   because Temores had placed his Taser back in his holster and was too close to deploy it.  *Id.*

24   _____

25   [3] The officers' reports conflict on this point.  Defendant Wagner states that Plaintiff "dart[ed] away
     from the van, toward the fence by the sidewalk."  Sherman Decl. Ex. 2 at 34.  However, Defendant
26   Burger clearly states, "I pulled him out of the van.  I moved the suspect away from the van and
     against a residential fence."  *Id.* at 38; *see also* Sherman Decl. Ex. 21 (Declaration of Kelly Burger)
27   ¶ 12 ("I grabbed Plaintiff's right should[er] and pull him out of the van.  I then moved him away
     from the van and placed him against a residential fence.").  The video provided by Defendants also
28   appears to show Defendant Burger pulling Plaintiff from the van and forcing him back against the
     fence.  *See* Sherman Decl. Ex. 14 at 10:10:20-27.

5

1  Apparently convinced that Plaintiff was attempting to escape and concerned that there might be a

2  weapon in the van, Defendant Burger shot one Taser cartridge at Plaintiff from approximately one

3  foot away.  *Id.* at 38.  Defendant Burger reported that after he activated his Taser, Plaintiff

4  "appeared to be dancing on his feet."  *Id.*  Thereafter, however, the officers claim that Plaintiff

5  charged at Defendant Burger and either hit or attempted to hit him.  *Id.* at 30, 29.  Defendant

6  Burger then pulled Plaintiff to the ground, and Defendants Temores and Wagner fought Plaintiff on

7  the ground while Burger reloaded his Taser.  *Id.* at 30, 39.  The officers claim that Plaintiff

8  continued to resist arrest, kicking and hitting them.  *Id.* at 30, 34.  During the struggle on the

9  ground, Defendant Temores activated his Taser in "stun-drive" mode and drove the Taser into

10 Plaintiff's front torso.  *Id.* at 30.  After that, Plaintiff stopped fighting and complied with verbal

11 commands, and Defendants were able to handcuff and arrest him.  *Id.*  Defendants' reports indicate

12 that Plaintiff was bleeding from his left forearm, causing "a small puddle of blood to gather on the

13 sidewalk."  *Id.* at 34, 39.  Plaint also suffered abrasions to his upper left arm, left shoulder, below

14 his right eye, and to both front thighs.  *Id.* at 34.

15 ### C.  Plaintiff's Account of the Use of Force

16 Plaintiff's version of the facts leading up to the Taser deployment is somewhat different.

17 He claims that after he heard Defendant Burger state that he was under arrest, Plaintiff turned

18 around and picked up his cell phone to call someone to secure his vehicles and possessions so that

19 they would not be impounded.  Ciampi Decl. ¶ 69.  However, he claims that as soon as he began to

20 pick up his cell phone, Defendants Burger and Temores rushed at him.  *Id.*  Plaintiff therefore

21 scooted into his vehicle so that he could complete his phone call.  *Id.*  At that point, Defendants

22 Burger and Temores pointed their Tasers at Plaintiff and ordered him to exit the vehicle.  *Id.*

23 Plaintiff claims that he complied with this order, pausing on his way out of the van to pick up an

24 open bottle of Diet Sprite that had fallen to the ground and set it upright.  *Id.*  Plaintiff states that he

25 distinctly remembers walking over to the residential fence of his own accord, with his hand in the

26 air.[4]  *Id.* ¶ 70.  Once at the fence, Plaintiff turned around to face Defendant Burger, with Defendant

27

28 _____
[4] It appears, based on Plaintiff's account, that he was still attempting to complete his phone call and
holding his cell phone in his other hand.

Case No.: 09-CV-02655-LHK
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Temores standing an arm's length away.  *Id.*  Defendant Burger ordered Plaintiff to put his hands

behind his back.  *Id.* ¶ 71. Concerned that he could lose his belongings permanently if arrested,

Plaintiff wanted to complete his phone call and asked Defendant Burger if he could do so.  *Id.*

Plaintiff claims that, then, without any warning, Defendant Burger fired his Taser gun while aiming

the laser sight at Plaintiff's face.  *Id.*

　　　　Plaintiff felt "strong, powerful and extremely painful surges of pressure" in his arm and

chest. *Id.* ¶ 71.  He states that the pain was "both excruciating and frightening" and that if felt "like

someone had hooked a fire hose to my arm and were pumping thousands gallons of water into my

body through my arm." *Id.* at ¶¶ 71-72.  Plaintiff began to swing his left arm violently in an

attempt to dislodge the Taser probe from his arm. *Id.* at ¶ 71.  He states that once he realized that

Burger did not intend to stop Tasing him, he instinctively attempted to knock the Taser out of

Burger's hands.  *Id.* at ¶ 72.  Plaintiff claims that after he hit the Taser gun, the flow of electricity

stopped, but then Defendant Burger pulled the trigger on the Taser a second time.  *Id.* at ¶ 74.

Plaintiff estimates that Defendant Burger shocked him for over 20 seconds total.  *Id.* at 76.  He also

claims that Defendant Temores deployed his Taser gun in the direction of Plaintiff's face and groin

area. *Id.* ¶ 78.  In addition to the injuries acknowledged by Defendants, Plaintiff claims that he

suffered a puncture wound to his rear end and that there was blood all over the back of his shorts

from that wound.  *Id.* at ¶ 81.

### D.  Plaintiff's Criminal Proceedings and Initiation of the Instant Action

　　　　After his arrest on March 15, 2008, Plaintiff was charged with obstructing or resisting an

officer in performance of his duties, Cal. Penal Code § 69.  *See* Transcript of December 17, 2008

Proceedings in *People v. Ciampi*, No. BB833050, Sherman Decl. Ex. 7 at 185.  The state court held

preliminary examination proceedings beginning on December 1, 2008, and considered a motion to

suppress on December 17, 2008.  *See* Sherman Decl. Exs. 4-7.  In the motion to suppress,

Plaintiff's criminal defense counsel argued that the ruse employed by Officer Temores –

pretending to call a tow truck to tow Plaintiff's van – was unlawful and required suppression of the

Officers' subsequent observations of Plaintiff.  Judge Thang Nguyen Barrett agreed, finding that at

the point of the Officers' initial contact with Plaintiff, he was suspected of no criminal activities

United States District Court
For the Northern District of California

1   and had a right to refuse to talk to the police.  Sherman Decl. Ex. 7 at 185.  Judge Barrett reasoned

2   that the ruse employed by Officer Temores to coerce Plaintiff from his van unlawfully

3   circumvented Plaintiff's right not to submit to a consensual encounter.  *Id.*  Concluding that the rest

4   of the encounter flowed from the unlawful ruse, Judge Barrett granted the motion to suppress and

5   dismissed the criminal complaint.  *Id.* at 185-86.

6         Approximately six months later, Plaintiff filed the instant action in federal court against the

7   City of Palo Alto; former Palo Alto Chief of Police Lynn Johnson; current Chief of Police Dennis

8   Burns; Officers Temores, Wagner, and Burger; Sergeant Natasha Powers; and Agent Dan Ryan.

9   The operative Second Amended Complaint asserts seven causes of action under state and federal

10  law: (1) violations of the Fourth and Fourteenth Amendment, pursuant to 42 U.S.C. § 1983; (2)

11  assault and battery; (3) intentional infliction of emotional distress; (4) negligence; (5) defamation;

12  (6) malicious prosecution; and (7) false arrest and false imprisonment.  Defendants now move for

13  summary judgment on all of these claims.

14  **II.  Legal Standard**

15        Summary judgment should be granted if there is no genuine issue of material fact and the

16  movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*,

17  477 U.S. 317, 321 (1986).  Material facts are those which may affect the outcome of the case, and a

18  dispute as to a material fact is "genuine" only if there is sufficient evidence for a reasonable trier of

19  fact to decide in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

20  (1986).  On a motion for summary judgment, the Court draws all reasonable inferences that may be

21  taken from the underlying facts in the light most favorable to the nonmoving party.  *Matsushita*

22  *Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "[T]he district court does

23  not assess credibility or weigh the evidence, but simply determines whether there is a genuine

24  factual issue for trial." *House v. Bell*, 547 U.S. 518, 559-560 (2006).

25        The moving party has the initial burden of production for showing the absence of any

26  material fact.  *Celotex*, 477 U.S. at 331.  The moving party can satisfy this burden in two ways.

27  "First the moving party may submit affirmative evidence that negates an essential element of the

28  nonmoving party's claim.  Second, the moving party may demonstrate to the Court that the

United States District Court
For the Northern District of California

8

United States District Court
For the Northern District of California

1  nonmoving party's evidence is insufficient to establish an essential element of the nonmoving

2  party's claim." *Id.* Once the moving party has satisfied its initial burden of production, the burden

3  of proof shifts to the nonmovant to show that that there is a genuine issue of material fact.  A party

4  asserting that a fact is genuinely disputed must support that assertion by either citing to particular

5  parts of materials in the record or by showing that the materials cited by the moving party do not

6  establish the absence of a genuine dispute.  Fed. R. Civ. P. 56(c).  The nonmovant must go beyond

7  its pleadings "and by her own affidavits, or by the depositions, answers to interrogatories, and

8  admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*,

9  477 U.S. at 324 (internal quotation marks and citation omitted).

10  **III. Objections to Evidence**

11  On a Rule 56 motion for summary judgment, a party "may object that the material cited to

12  support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed.

13  R. Civ. Pro. 56(c)(2).  In this case, both parties have raised objections to the evidence submitted.

14  **A.  Defendants' Objections to Plaintiff's Evidence**

15  In support of his opposition brief, Plaintiff, proceeding *pro se*, submitted several hundred

16  pages of printed documents, including various news articles, transcripts, and photographs, as well

17  as nine DVDs containing audio and video recordings and over 1,500 pages of electronic

18  documents.  Defendants object to many of these submissions on grounds of irrelevance, improper

19  opinion, hearsay, lack of personal knowledge, and lack of authentication.  The Court finds that

20  much of the evidence to which Defendants object is not relevant to Defendants' motion for

21  summary judgment and need not be considered in resolving the motion.  However, the Court will

22  briefly consider a number of Defendants' specific challenges that bear on evidence relevant to the

23  motion.  *See Doe v. Starbucks, Inc.*, No. SACV 08–0582 AG (CWx), 2009 WL 5183773, at *1

24  (C.D.Cal. Dec. 18, 2009) ("In motions for summary judgment with numerous objections, it is often

25  unnecessary and impractical for a court to methodically scrutinize each objection and give a full

26  analysis of each argument raised.").

27  First, Plaintiff has submitted a number of newspaper articles in support of his defamation

28  claim.  Ciampi Decl. Ex. 321.  Defendants object to these articles on grounds of relevance, hearsay,

9

1    and lack of proper authentication.  However, these articles are directly relevant to Plaintiff's

2    defamation claim because they demonstrate publication of statements made by several of the

3    Defendants.  *See* Fed. R. Evid. 401 (evidence is relevant if it has "any tendency to make the

4    existence of any fact that is of consequence to the determination of the action more probable or less

5    probable").  Moreover, insofar as they are offered as evidence of publication, the articles are not

6    hearsay because they are not offered to prove the truth of the statements contained therein.  *See*

7    Fed. R. Evid. 801(c).  Finally, the Court finds that most of the articles are sufficiently

8    authenticated.  Pursuant to Federal Rule of Evidence 902(6), printed materials purporting to be

9    newspapers or periodicals are self-authenticating.  Here, however, Plaintiff submits copies of

10   newspapers, as well as print-outs of internet publications.  Generally, evidence will be admissible if

11   "sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity

12   or identification."  *United States v. Tank*, 200 F.3d 627, 630 (9th Cir. 2000) (quoting *United States*

13   *v. Black*, 767 F.2d 1334, 1342 (9th Cir. 1985)).  In considering internet print-outs, courts have

14   considered the "distinctive characteristics" of the website in determining whether a document is

15   sufficiently authenticated.  *See, e.g. Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, No. SACV

16   06-0827 AG (RNBx), 2008 WL 1913163, at *6 (C.D. Cal. Mar. 27, 2008); *Perfect 10, Inc. v.*

17   *Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1153-54 (C.D. Cal. 2002).  In this case, most of the

18   articles submitted by Plaintiff contain sufficient indicia of authenticity, including distinctive

19   newspaper and website designs, dates of publication, page numbers, and web addresses.  *See*

20   *Premier Nutrition, Inc.*, 2008 WL 1913163, at *6 (finding internet print-outs including web address

21   and dates printed to be sufficiently authenticated).  Only the internet print-outs of the Daily News

22   articles contained in Exhibits 321-4 and 321-7, which do not contain a web address and lack other

23   identifying characteristics, appear to be insufficiently authenticated.  The Court will not consider

24   these two articles, but overrules the objection as to the remainder of the articles in Exhibits 321-6

25   to 321-14.

26          Second, Plaintiff has submitted over 1,500 pages of printed and electronic documents in

27   which he purports to analyze the Taser and Mobile Audio Visual recordings of the incident in order

28   to demonstrate that Defendants have tampered with the evidence.  *See, e.g.*, Ciampi Decl. Exs. 508-

Case No.: 09-CV-02655-LHK
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    4 to 508-9, 512 (consisting of Microsoft Word documents totaling over 1500 pages of text and still

2    frames from the Taser and MAV recordings), 517-8 to 517-12, 520.  Defendants object that

3    Plaintiff's analysis of the Taser and MAV recordings constitutes lay witness opinion that is not

4    admissible under Federal Rule of Evidence 701.  In this case, Plaintiff has not argued that he is

5    offering an expert opinion, and he has set forth no facts establishing that he would qualify as an

6    expert of any kind.  Pursuant to Federal Rule of Evidence 701, a lay witness may testify only as to

7    those opinions or inferences which are "(a) rationally based on the perception of the witness, (b)

8    helpful to a clear understanding of the witness' testimony or the determination of a fact in issue,

9    and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule

10   702."  Fed. R. Evid. 701.  Accordingly, lay witness opinions are admissible only to the extent that

11   they are "based upon . . . direct perception of the event, are not speculative, and are helpful to the

12   determination" of factual issues before the jury.  *United States v. Freeman*, 498 F.3d 893, 905 (9th

13   Cir. 2007).

14          The Court agrees that the inferences and opinions contained in Plaintiff's analysis of the

15   Taser and MAV recordings do not fall within the scope of Rule 701.  Although Plaintiff directly

16   perceived the March 15, 2008 incident, the opinions he offers in his analysis of the recordings are

17   based not upon his own experience of the incident, but upon a frame-by-frame analysis of video

18   recordings.  *See United States v. Durham*, 464 F.3d 976, 982 (9th Cir. 2006) ("opinion testimony of

19   lay witnesses must be predicated upon concrete facts within their own observation and

20   recollection") (quotation marks and citation omitted).  For the most part, the inferences and

21   opinions Plaintiff draws are based upon minute differences, sometimes imperceptible to this Court,

22   between the various recordings.  Based on its review of the documents submitted, the Court finds

23   that Plaintiff's analysis is speculative and unlikely to assist a jury in determining the factual issues

24   before it.  The Court finds, further, that analysis of video and audio recordings for evidence of

25   tampering or alteration requires technical or specialized knowledge and is not a proper subject of

26   lay opinion.  *Cf. United States v. Rearden*, 349 F.3d 608, 613 (9th Cir. 2003) (discussing expert

27   testimony offered to show that images were not manipulated or altered);  *Davis v. Clearlake Police

28   Dept.*, No. C-07-03365 EDL, 2008 WL 4104344 at *10 (N.D. Cal. Sept. 3, 2008) (sustaining

Case No.: 09-CV-02655-LHK
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    objection to letter offered to support argument that audio recording was altered as improper expert

2    testimony).  Accordingly, Defendants' objection to this evidence is sustained.

3    **B.  Plaintiff's Objections to Allegedly Altered Evidence and False Statements**

4          Plaintiff also objects to much of the Defendants' evidence and argues that their motion

5    should be stricken as based on false statements and evidence.  First, Plaintiff objects to statements

6    by Defendants that they were dispatched to the scene based on a report that Plaintiff made Mr.

7    Alsman's wife and daughter uncomfortable by the way he watched them.  It is quite clear that Mr.

8    Alsman never indicated that Plaintiff watched or leered at his wife or daughter.  Sherman Decl. Ex.

9    18 (recording of 911 call).  However, it seems that for unexplained reasons the 911 call was

10   inaccurately reported on the Computer Automated Dispatch ("CAD") report that was dispatched to

11   patrol cars.  *See* Sherman Decl. Ex. 3 (CAD report); *id.* Ex. 4 at 81 (explaining that CAD reports

12   are dispatched to patrol cars via computer).  The CAD report states that Mr. Alsman called

13   regarding a man who "makes his wife and young daughters uncomfortable they [sic] way he

14   watches them."  *Id.* Ex. 3.  It is unclear to what extent the Defendant officers received their

15   information about Plaintiff from the CAD report as opposed to the radio dispatch, which only

16   included the code for "suspicious vehicle" and indicated that the subject was living out of a van.

17   *See* Sherman Decl. Ex. 18 at 3:18-54 (recording of radio dispatch); *id.* Ex. 4 at 82 (explaining code

18   for suspicious vehicle).  At the very least, however, there is evidence that some of the Defendants

19   were dispatched to the scene based on a CAD report which indicated that Plaintiff watched

20   Alsman's wife and daughter in a way that made them uncomfortable.  While this misinformation is

21   quite unfortunate, it is not grounds for striking portions of Defendants' motion or evidence.

22          Second, Plaintiff argues that Defendants' motion should be stricken because Defendants

23   have tampered with the evidence and failed to provide Plaintiff with the original recordings from

24   the Taser cameras involved in the incident.  Defendants have submitted four recordings of the

25   incident: two Mobile Audio Video ("MAV") recordings taken from cameras on Temores' and

26   Burger's patrol cars, and two Taser video recordings taken from cameras on Temores' and

27   Burger's Taser guns.  These recordings have been the subject of several motions to compel, and

28   Plaintiff has repeatedly argued that Defendants altered, manipulated, or even destroyed this

12

United States District Court
For the Northern District of California

1   evidence.  Based on the history of motions to compel in this case, it appears that, at times,

2   Defendants have not fully or promptly complied with their discovery obligations.  Indeed, just

3   before the hearing on this motion, Magistrate Judge Paul S. Grewal granted Plaintiff's motion to

4   compel Defendants to provide him with copies of MAV recordings containing the original

5   watermark.  *See* Order Granting Mot. to Compel (Apr. 21, 2011), ECF No. 144.  It also appears

6   that Defendants and their expert have made errors during the discovery process that have

7   contributed to Plaintiff's suspicions regarding tampering.  *See* Def.'s Suppl. Ex. 13 in Supp. of

8   Mot. for Summary Judgment (Decl. of Andrew Hinz), ECF No. 129 (declaration submitted to

9   correct errors in the original expert declaration submitted with Defendants' summary judgment

10  motion).  However, as discussed above, Plaintiff has not produced admissible expert testimony

11  suggesting that Defendants altered or tampered with the MAV or Taser recordings.[5]  Accordingly,

12  Plaintiff's request to strike this evidence and/or Defendants' motion is denied.

13  **IV.  Federal Claims Pursuant to 42 U.S.C. § 1983**

14          In his Second Amended Complaint, Plaintiff brings a number of claims for violations of his

15  Fourth Amendment rights pursuant to 42 U.S.C. § 1983.[6]  Defendants seek summary judgment on

16  grounds that no constitutional violation occurred, or, in the alternative, that they are entitled to

17

18  _____

    [5] Because documents submitted in connection with this motion referenced a forensic analysis of the
19  MAV and Taser recordings conducted by Gregg Stutchman, the Court requested the Plaintiff
    provide a copy of this analysis.  *See* Stutchman Forensic Report, ECF No. 145.  However, the
20  analysis does not provide any facts pertaining to Stutchman's qualifications or the reliability of his
    methods, and therefore it cannot be considered as expert opinion.  *See Avila v. Willits*
21  *Environmental Remediation Trust*, 633 F.3d 828, 836 (9th Cir. 2011) (noting that to be admissible
    as expert opinion, the expert witness must be qualified "by knowledge, skill, experience, training,
22  or education," and the opinion must be based upon reliable principles and methods).

23  [6] The SAC also alleges violations of Plaintiff's right to due process and equal protection, but does
    not indicate the basis for these claims.  In his opposition brief and at the motion hearing, Plaintiff
24  indicated that the basis for his due process claim is the withholding of material, exculpatory
    evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), alleged to have occurred during
25  his criminal case.  As pled in the SAC, however, Plaintiff's § 1983 claim merely states that
    defendants' conduct "constitutes a deprivation of Plaintiff's right to be free from an unlawful entry,
26  an unlawful arrest, and unreasonable searches and seizures, and the right to be free from
    interference with the zone of privacy," and "further constitutes obstruction of justice with the
27  malicious intent to deprive Plaintiff of his rights to due process and equal protection of the law."
    SAC ¶ 53.  These vague allegations regarding obstruction of justice and deprivation of due process
28  are not sufficient to plead a § 1983 claim based on alleged *Brady* violations.

13

1    qualified immunity for any constitutional violation found by the Court.  Accordingly, the Court

2    will first provide a framework for addressing Defendants' claims of qualified immunity and then

3    turn to the substance of each of Plaintiff's federal claims.  For the reasons discussed below, the

4    Court GRANTS summary adjudication of Plaintiff's § 1983 claims in favor of the Defendants.

5            **A.  Qualified Immunity Doctrine**

6          The doctrine of qualified immunity protects government officials "from liability for civil

7    damages insofar as their conduct does not violate clearly established statutory or constitutional

8    rights of which a reasonable person would have known."  *Pearson v. Callahan*, 129 S.Ct. 808, 815

9    (2009).  Because qualified immunity is an immunity from suit, rather than a defense to liability, it

10   is effectively lost if a case is erroneously permitted to go to trial.  *Id.*  For this reason, the Supreme

11   Court has stressed the importance of resolving immunity questions at the earliest possible stage in

12   litigation.  *Id.*  Therefore, if, drawing all reasonable inferences in favor of the nonmoving party, it

13   is clear as a matter of law that the defendants are entitled to qualified immunity, summary

14   judgment should be granted.  *See Wilkinson v. Torres*, 610 F.3d 546, 548 (9th Cir. 2010) (reversing

15   denial of summary judgment where defendants were entitled to qualified immunity as a matter of

16   law).  Where a defendant's entitlement to qualified immunity turns on genuinely disputed issues of

17   fact, however, summary judgment is not appropriate.  *See Espinosa v. City and County of San*

18   *Francisco*, 598 F.3d 528, 532 (9th Cir. 2010) (affirming denial of summary judgment because there

19   were genuine issues of fact regarding whether officers violated plaintiff's Fourth Amendment

20   rights and whether those rights were clearly established); *Serrano v. Francis*, 345 F.3d 1071, 1077

21   (9th Cir. 2003) ("If a genuine issue of material fact exists that prevents a determination of qualified

22   immunity at summary judgment, the case must proceed to trial.").

23         In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-part approach

24   for analyzing qualified immunity.  The analysis contains both a constitutional inquiry and an

25   immunity inquiry.  *Johnson v. County of Los Angeles*, 340 F.3d 787, 791 (9th Cir. 2003).  The

26   constitutional inquiry requires the court to determine this threshold question: "Taken in the light

27   most favorable to the party asserting the injury, do the facts alleged show the officer's conduct

28   violated a constitutional right?"  *Saucier*, 533 U.S. at 201.  The immunity inquiry, on the other

**United States District Court**
For the Northern District of California

14

hand, asks whether the right Plaintiff claims was clearly established. *Id.* "The relevant, dispositive

inquiry in determining whether a right is clearly established is whether it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. The

court has discretion to consider the constitutional and immunity inquiries in any sequence.

*Pearson*, 129 at 818.

### B.  Fourth Amendment Claims against Defendants Wagner, Temores, and Burger

### 1.        Unlawful detention and arrest

In his § 1983 claim, Plaintiff alleges that Defendants subjected him to an unreasonable

seizure and unlawfully detained and arrested him in contravention of his Fourth Amendment rights.

SAC ¶ 53.  The parties' briefs focus on two "seizures" or "detentions" that occurred during the

course of the March 15, 2008 incident: (1) Defendant Temores' conduct in getting Plaintiff to exit

the van in the first instance, and (2) the attempt to detain Plaintiff after he returned to the van.  The

Court will consider each of these seizures in turn.

### a.   Initial Attempt to Remove Plaintiff from the Van

First, the parties focus on Defendant Temores' initial attempt to remove Plaintiff from the

van by pretending to call a tow truck to tow Plaintiff's truck.  As noted above, the state court found

this "ruse" unlawful and dismissed the criminal charges against Plaintiff on that ground.

Defendants argue that the state court applied the wrong legal principles and urge this Court to find

that Temores' ruse was lawful.[7]

It is well-settled that police officers may use deceptive tactics under some circumstances.

*United States v. Bramble*, 103 F.3d 1475, 1478 (9th Cir. 1996).  There are limits to the lawful use

of deception, however.  For instance, an officer may not gain entry to a suspect's home by

misrepresenting the scope, nature, or purpose of a government investigation.  *United States v.*

*Bosse*, 898 F.2d 113, 115 (9th Cir. 1990).  Such a "ruse entry[,] when the suspect is informed that

---

[7] Because the Defendant police officers were not in privity with the State in the criminal
proceeding, issue preclusion does not apply, and they are permitted to relitigate the
constitutionality of Temores' "ruse" before this court.  *See, e.g.*, *Medina v. Miller*, 114 F.3d 1195,
at *1 (9th Cir. 1997) (table) ("individual law enforcement officers are not collaterally estopped by
state court judgments that reverse criminal convictions on constitutional grounds"); *Yezek v.*
*Mitchell*, No. C-05-03461 TEH, 2007 WL 61887, at *4-5 (N.D. Cal. Jan. 8, 2007) (individual
police officer not estopped from relitigating Fourth Amendment issue).

Case No.: 09-CV-02655-LHK
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1    the person seeking entry is a government agent but is misinformed as to the purpose for which the

2    agent seeks entry[,] cannot be justified by consent." *Id.*   Similarly, although the police ordinarily

3    have authority to conduct a warrantless arrest of a suspect standing in the doorway of his home,

4    such an arrest is not lawful if the suspect came to the doorway in response to misrepresentations by

5    the police. *United States v. Johnson*, 626 F.2d 753, 756-57 (9th Cir. 1980).   The concern about

6    police deception is "at its zenith when government officials lie in order to gain access to places and

7    things they would otherwise have no legal authority to reach." *United States v. Alverez-Tejeda*,

8    491 F.3d 1013, 1017 (9th Cir. 2007).   Ultimately, "general Fourth Amendment principles apply:

9    the ruse becomes a search if it intrudes on the person's reasonable, subjective expectation of

10   privacy." *United States v. Garcia*, 997 F.2d 1273, 1280 (9th Cir. 1993).

11          Here, Plaintiff was suspected of no criminal activity and therefore had a right to remain in

12   his van and refuse a consensual contact with Defendants Temores and Wagner. *See Florida v.

13   Royer*, 460 U.S. 491, 497-98 (1983) (absent reasonable suspicion, police may approach any person

14   in a public place, but that person need not answer any questions and "may go on his way").   It

15   would seem, therefore, that Temores employed the ruse precisely to "gain access to places and

16   things they would otherwise have no legal authority to reach," *Alverez-Tejeda*, 491 F.3d at 1017 –

17   that is, to gain access to Plaintiff in a public space.   The Court agrees with Plaintiff, and with the

18   state court, that by circumventing his right to refuse a consensual encounter, the ruse intruded upon

19   Plaintiff's reasonable expectation of privacy and violated his Fourth Amendment rights.

20          Defendants argue, however, that they are entitled to qualified immunity for any

21   constitutional violations arising from Temores' use of the ruse.   They point out that the law

22   prohibiting police deception has been applied primarily in the context of a residence, rather than a

23   vehicle or other location.   The federal cases this Court has identified deal with "ruse entry" into a

24   home or deception used to lure a person to the doorway of his residence. *See Johnson*, 626 F.2d at

25   756-57 (emphasizing enhanced privacy expectations in one's home).   Similarly, the California

26   cases relied upon by the state court dealt with "a ruse that lures a suspect out of a residence."[8]

---

[8] It is not entirely clear whether the decisions in these California cases are made under state or
federal law.  Both cases refer to both state and federal cases, but rely primarily on California case
law.

Case No.: 09-CV-02655-LHK
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

1    *People v. Reyes*, 83 Cal. App. 4th 7, 12, 98 Cal. Rptr. 2d 898 (Cal. Ct. App. 2000); *see also id.* ("A

2    deception used to gain entry into a home and a ruse that lures a suspect out of a residence is a

3    distinction without much difference"); *see also People v. Reeves*, 61 Cal. 2d 268, 273, 38 Cal. Rptr.

4    1 (1964) (evaluating ruse to induce opening of hotel room door).

5              As Defendants note, Fourth Amendment jurisprudence has long viewed vehicles as

6    presenting different safety concerns and privacy expectations than stationary residences.  While the

7    Supreme Court has recognized that individuals have privacy interests in their vehicles, it has found

8    that those interests are due a lesser degree of protection for two reasons: (1) the exigency that

9    accompanies the "ready mobility" of vehicles, and (2) the reduced expectations of privacy

10   associated with "the pervasive regulation of vehicles capable of traveling on the public highways."

11   *California v. Carney*, 471 U.S. 386, 390-91 (1985).  The Supreme Court has found, moreover, that

12   this lesser degree of protection holds even when the vehicle is capable of functioning as a home, as

13   long as the vehicle is readily mobile and located "in a setting that objectively indicates that the

14   vehicle is being used for transportation."  *Id.* at 393.  Under this principle, motor homes and house

15   boats have been treated as vehicles for purposes of Fourth Amendment analysis, even where those

16   vehicles possess many attributes of a home.  *See id.* at 393-94 (holding that the automobile

17   exception to the warrant requirement applies to a motor home that is readily mobile, licensed to

18   operate on public streets, and parked in a public lot); *United States v. Albers*, 136 F.3d 670, 673

19   (9th Cir. 1998) (holding that readily mobile houseboat found in open public waters is subject to the

20   automobile exception).  Here, although Defendants had some evidence that Plaintiff was using his

21   van as a home, Plaintiff's van was parked on a public street, readily mobile,[9] and registered for use

22   on public roads and highways.  Thus, for purposes of the Fourth Amendment, Plaintiff's vehicle

23   would most likely be treated as a vehicle, subject to lesser protections.  *See Carney*, 471 U.S. at

24   394 n.3 (noting that factors used to determine whether the automobile exception applies include

25   "location, whether the vehicle is readily mobile or instead, for instance, elevated on blocks,

26

27   _____

     [9] The 911 call indicates that Plaintiff moved his vehicle to different locations, *see* Sherman Decl.
28   Ex. 18, and Plaintiff acknowledges that he frequently moved his van between Lincoln Avenue and
     downtown Palo Alto.  Ciampi Decl. ¶ 63.

17

**United States District Court**
For the Northern District of California

1    whether the vehicle is licensed, whether it is connected to utilities, and whether it has convenient

2    access to a public road").

3          Defendants argue that case law permitting officers to remove a person from his vehicle for

4    purposes of officer safety would have led a reasonable officer to believe that Plaintiff could

5    lawfully be extracted from his vehicle either by force or by ruse.  *See Pennsylvania v. Mimms*, 434

6    U.S. 106, 111 n.6 (holding that "once a motor vehicle has been lawfully detained for a traffic

7    violation, the police officers may order the driver to get out of the vehicle"); *Maryland v. Wilson*,

8    519 U.S. 408, 413 (1997) (extending *Mimms* rule to permit removal of passengers following a

9    lawful traffic stop).  Because the police had not lawfully detained Plaintiff's van prior to the

10   attempted extraction, the Court does not agree that *Mimms* and *Wilson* would justify removal of

11   Plaintiff by ruse or by force.  Nor does Plaintiff's refusal to speak to the police, without more,

12   furnish reasonable grounds to detain Plaintiff and remove him from his car.  *See Florida v. Royer*,

13   460 U.S. at 498.  Nonetheless, the Court agrees that the "weighty interest in officer safety" during

14   vehicle stops, the lesser protection accorded to readily mobile vehicles, and the unsettled scope of

15   case law on unlawful ruses, taken together, is sufficient to demonstrate that the law was not clearly

16   established at the time of Plaintiff's seizure.  While case law clearly prohibited a ruse entry into a

17   home, or a ruse that lures a person out of the heightened protection of a residence, it was not

18   entirely clear, in March 2008, that this line of cases should extend to ruses intended to lure a person

19   out of a less protected location, such as a vehicle parked on a public street.  Given the reduced

20   expectations of privacy recognized in vehicles and the weight given to officer safety concerns

21   surrounding vehicle stops, it was reasonable for the officers to think that deception, which is lawful

22   in some instances, would be justified under the circumstances they confronted.  Plaintiff has not

23   presented any case law suggesting that the law on this issue was clearly established.  Accordingly,

24   the Court finds that Defendants are entitled to qualified immunity as to any Fourth Amendment

25   violation caused by Officer Temores' use of a ruse to extract Plaintiff from his van.

26         In sum, the Court agrees with the determination of the state criminal court that by

27   circumventing Plaintiff's right to refuse a consensual encounter, the ruse employed by Defendant

28   Temores intruded upon Plaintiff's reasonable expectation of privacy and violated his Fourth

Case No.: 09-CV-02655-LHK
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   Amendment rights.  However, because the law regarding the use of ruses during vehicle contacts

2   was not clearly established at the time of the March 15, 2008 incident, the Court finds that

3   Defendants are entitled to qualified immunity on this claim.  For this reason, the Court GRANTS

4   Defendants' motion for summary adjudication as to this specific issue.

5                                  **b.  Seizure of Plaintiff upon Retreat Into Van**

6           The parties next dispute the constitutionality of Defendants' second attempt to remove

7   Plaintiff from the van and detain him.  After Plaintiff initially exited the van in response to

8   Temores' ruse, Defendant Burger arrived on the scene.  It is undisputed that Plaintiff was agitated

9   and exchanged angry words with Defendants Temores, Wagner, and Burger.  After Burger arrived,

10  the Defendants began to express concerns that Plaintiff was under the influence of a controlled

11  substance, and Plaintiff, fearful that he would be arrested and his possessions confiscated, retreated

12  into his van to make a call on his cell phone.  At that point, Defendants Burger and Temores

13  pointed their Tasers at Plaintiff, ordered him out of the van, and eventually Defendant Burger

14  forcibly pulled Plaintiff away from the van.  Defendants argue that this seizure was justified by

15  their reasonable suspicion that Plaintiff was engaged in the criminal activity of being under the

16  influence of a controlled substance.

17          Pursuant to the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968), the police

18  may conduct "a brief, investigatory search or seizure, so long as they have a reasonable, articulable

19  suspicion that justifies their actions."  *Gallegos v. City of Los Angeles*, 308 F.3d 987, 990 (9th Cir.

20  2002).  Officers may also use reasonable force to effect an investigatory detention where officer

21  safety is at issue.  *See Allen v. City of Los Angeles*, 66 F.3d 1052, 1056-57 (9th Cir. 1995); *see also*

22  *United States v. Jacobs*, 715 F.2d 1343, 1345-46 (9th Cir. 1983) ("the use of force in making a stop

23  will not convert the stop into an arrest 'if it occurs under circumstances justifying fears for personal

24  safety'") (quoting *United States v. Beck*, 598 F.2d 497, 501 (9th Cir. 1979)).  The reasonable

25  suspicion standard applied to investigatory stops is "'a less demanding standard than probable

26  cause,' and merely requires 'a minimal level of objective justification.'"  *Id.* (quoting *Illinois v.*

27  *Wardlow*, 528 U.S. 119, 123 (2000)).  In determining whether officers had reasonable suspicion to

28  justify a brief seizure, courts must "look at the 'totality of the circumstances' of each case to see

1    whether the detaining officer has a 'particularized and objective basis' for suspecting legal

2    wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  This approach allows officers to

3    "draw on their own experience and specialized training to make inferences from and deductions

4    about the cumulative information available" to them.  *Id.*  Nonetheless, an officer may not rely

5    upon a mere hunch to justify an investigatory stop.  *Id.* at 274.  Rather, "in justifying the particular

6    intrusion the police officer must be able to point to specific and articulable facts which, taken

7    together with rational inferences from those facts, reasonably warrant that intrusion."  *Terry v.*

8    *Ohio*, 392 U.S. 1, 21 (1968).

9          In this case, Defendants Temores, Wagner, and Burger claim that they had a reasonable

10   suspicion that Plaintiff was under the influence of a controlled substance, and that they needed to

11   bring Plaintiff under control for their own safety.  As discussed in the Background section,

12   Defendants have stated that they believed Plaintiff was under the influence of a controlled

13   substance for the following reasons: (1) Plaintiff was "clearly agitated beyond that of an average

14   person"; (2) Plaintiff was tensing his arms and clenching his fists, and his mouth trembled while he

15   talked to the officers; (3) Plaintiff had sores on his arms that Defendants claim resembled the "pock

16   marks" common to people who use intravenous drugs; and (4) Plaintiff's pupils were either dilated

17   or constricted.  Sherman Dec. Ex. 2 at 30, 33, 38.  Although Plaintiff acknowledges that he was

18   agitated and angry at the officers, he argues that the facts available to them did not amount to a

19   reasonable suspicion that he was under the influence of a controlled substance.    Plaintiff notes,

20   first, that the Defendants' reports regarding the size of his pupils contradict each other.  *See*

21   Sherman Decl. Ex. 2 at 30 (Temores report stating that Plaintiff's pupils were dilated); *id.* at 38

22   (Burger report stating that Plaintiff's pupils were constricted).  Plaintiff also points out that he

23   denied using controlled substances and showed Defendants that the sores were located on the tops

24   of his arms and not near his veins, where one would expect to see sores from intravenous drug use.

25   *See* Burger MAV recording, Sherman Decl. Ex. 15 at 10:10:06-12 (recording of Plaintiff denying

26   that he is a heroin addict and asking "why would I be popping needles there?").  He also argues

27   that mere anger and agitation do not provide a particularized and objective basis for inferring that a

28   person is under the influence.

Case No.: 09-CV-02655-LHK
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

Disregarding the inconsistent evidence of Plaintiff's pupil size, the Court nonetheless agrees with Defendants that the evidence submitted supports a "'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. 273.  Looking at the totality of the circumstances, as the Court must, the Court finds that Defendants were faced with an individual who had appeared unusually agitated since the beginning of the encounter, who exhibited tensed and twitching muscles that could be consistent with use of a controlled substance, and who had "fresh and old" sores on his arms that appeared similar to sores Defendants had observed on individuals suspected of illegal drug use.  Sherman Dec. Ex. 2 at 30, 33, 38; *id.* Ex. 21 ¶ 9. Plaintiff does not controvert these facts, but claims that Defendants drew an incorrect inference from them.  As Defendants point out, however, a "mistake of fact will not render a stop illegal, if the objective facts known to the officer gave rise to a reasonable suspicion that criminal activity was afoot." *United States v. Miguel*, 368 F.3d 1150, 1153 (9th Cir. 2004) (quoting *United States v. Mariscal*, 285 F.3d 1127, 1131 (9th Cir. 2002)).  Here, Defendants mistakenly believed that the sores on Plaintiff's arms were associated with intravenous drug use.  Although it appears that Plaintiff attempted to demonstrate that his sores were not consistent with drug use, given the tense and fast-moving circumstances, it was not unreasonable for Defendants to conclude otherwise. Reasonable suspicion requires a level of certainty "considerably short of . . . a preponderance of the evidence," and "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 274, 277.  In this case, the uncontroverted facts, taken together, are sufficient to support a reasonable suspicion that Plaintiff was under the influence. *See Ramirez v. City of Buena Park*, 560 F.3d 1012, 1021 (9th Cir. 2009) (finding reasonable suspicion that suspect was under the influence based on fact that the suspect appeared to be sleeping in a car parked outside a drug store with its parking lights on, suspect was breathing rapidly, and suspect gave a "testy" response when the officer tapped on his window).  Accordingly, the Court GRANTS Defendants' motion for summary adjudication on this claim, on grounds that Defendants had reasonable suspicion to justify a brief, investigatory detention of Plaintiff.  The Court will now consider whether the use of force that occurred following the initial investigatory stop was reasonable.

## 2.     Excessive force

Plaintiff also brings a Fourth Amendment claim based on the alleged use of excessive force during his detention and arrest.  The Fourth Amendment does not prohibit a law enforcement officer's use of reasonable force during an arrest.  *See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it").  The reasonableness of any particular use of force is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.*  The inquiry is an objective one, and the question is whether the officers' actions were "'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397.  In determining whether an officer's actions were objectively reasonable, the court must consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* at 396; *see also Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1095 (9th Cir. 2006).  The determination requires careful attention to the facts and circumstances of the particular case and a careful balancing of the individual's liberty interest against the government's interest in the application of force.  *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).  Because such balancing "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," the Ninth Circuit has "held on many occasions that summary judgment . . . in excessive force cases should be granted sparingly."  *Id.*

### a.  Use of Taser in Dart Mode

First the Court must consider Plaintiff's contention that Defendant Burger's deployment of his Taser against Plaintiff constituted excessive force in violation of Plaintiff's Fourth Amendment rights.[10]  Under Ninth Circuit analysis, the Court must "begin by analyzing the quantum of force—

---

[10] Although Defendant Burger actually deployed the Taser, Defendant Temores claims that he told Burger to do so.  *See* Sherman Decl. Ex. 2 at 30 ("I yelled to Officer Burger to deploy his Taser since I had just placed my Taser back into its holster and I was to [sic] close to deploy it.").  In addition, although Defendant Wagner did not affirmatively encourage Burger to deploy his Taser, she participated in the overall attempt to detain Plaintiff, and there is no evidence that she attempted to prevent Burger from using his Taser.  Under Ninth Circuit precedent, "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or

the type and amount of force" that the Defendants used against Plaintiff. *Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010). With respect to Tasers, a series of recent Ninth Circuit decisions has clarified the quantum of force associated with the different ways in which a Taser can be deployed. In *Bryan*, the Ninth Circuit considered the use of a Taser in dart mode – that is, when an officer uses the Taser to shoot a pair of aluminum darts tipped with stainless steel barbs that are connected to the Taser by insulated wires. *Id.* The *Bryan* court explained that when the probes strike a person, an electrical charge is delivered, and "[t]he electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless." *Id.* Based on its analysis of the "physiological effects, the high levels of pain, and foreseeable risk of physical injury," the Ninth Circuit concluded that the use of a Taser in this manner constituted an "intermediate, significant level of force that must be justified by the governmental interest involved." *Id.* at 825-26. In contrast, the Ninth Circuit in *Brooks v. City of Seattle* considered use of a Taser in "drive-stun" mode, which "involves touching the Taser to the body and causes temporary, localized pain only." *Brooks v. City of Seattle*, 599 F.3d 1018, 1026 (9th Cir. 2010). The *Brooks* court found that use of a Taser in drive-stun mode, although "certainly a serious intrusion" is "less than the intermediate" intrusion found in *Bryan*. *Id.* at 1028.

In this case, it is undisputed that Defendant Burger deployed his Taser in dart mode. Thus, pursuant to *Bryan*, Defendant Burger employed an "intermediate, significant level of force that must be justified by the governmental interest involved." *Bryan*, 630 F.3d at 825-26. In order to determine whether this level of force was objectively reasonable, the Court must consider (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* at 826 (citing *Graham*, 490 U.S. at 396). As to the severity of the crime at issue, Defendants acknowledge that this factor does not weigh in favor of the use of force, given that

---

other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (quoting *United States v. Koon*, 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996). Defendants have not argued that Wagner attempted to intercede or lacked a reasonable opportunity to do so. Accordingly, if a reasonable officer would have known that Burger's use of the Taser amounted to excessive force, all three officers on the scene may be held liable. *See Motley v. Parks*, 383 F.3d 1058, 1071 (9th Cir. 2004) (finding that officers who either participated in or failed to intervene to stop an unreasonable search could be held liable).

United States District Court
For the Northern District of California

1    Plaintiff was contacted for purposes of community policing and was not suspected of any crime.

2    Defs.' Mot. for Summary Judgment at 12.  At most, Plaintiff was suspected of being under the

3    influence of a controlled substance, a misdemeanor.  Given the relatively minor and non-violent

4    nature of this crime, this factor weighs against of the use of significant, intermediate-level force.

5    *See Bryan*, 630 F.3d at 829 (reasoning that factor weighs in favor of plaintiff where crime was a

6    misdemeanor that is not inherently dangerous or violent); *Hammer v. Gross*, 932 F.2d 842, 846

7    (9th Cir. 1991) (indicating that offense of drunk driving "while certainly not to be taken lightly,

8    was a misdemeanor" and therefore would weigh in favor of plaintiff).

9           The second factor and third factors, regarding the safety threat posed and resistance/evasion

10    of arrest, hinge on issues of genuine factual dispute and cannot be definitely resolved on summary

11    judgment.  Defendants argue that Plaintiff posed a safety threat from the time that he retreated into

12    his van, where he could have had a weapon accessible.  However, in the recordings submitted by

13    Defendants, while Plaintiff appears angry and agitated after he first emerges from the van in

14    response to Temores' ruse, *see* Burger MAV recording, Sherman Decl. Ex. 15 at 10:09:50-10:45

15    (recording of Plaintiff swearing and angrily asking why he is being harassed), once he retreats back

16    into the van, Plaintiff appears relatively calm and somewhat cooperative.  On the recording made

17    by Burger's Taser camera, Plaintiff can be seen sitting in the van, making a call on his cell phone

18    in his right hand and holding his left hand in his lap.  Sherman Decl. Ex. 12B at 0:00-02.  When

19    one of the Defendants states "I'm gonna Tase you," Plaintiff calmly states that he is calling his

20    lawyer.  *Id.*  Seconds later, when one of the Defendants says, "let me see your hands," Plaintiff

21    raises his left hand and also slightly opens the palm of his right hand to show that he is holding

22    only his cell phone to his ear.  *Id.* at 0:03-10.  He remains seated in the van with his right hand

23    holding the cell phone to his ear and his left hand in the air until he begins to exit the vehicle, of his

24    own accord, several seconds later.  *Id.*  On his way out of the van, Plaintiff picks up a two-liter

25    soda bottle on the ground and appears to set it upright.  *Id.* at 0:18-21.  At that point, Burger

26    appears to forcibly pull Plaintiff away from the car and push him across the sidewalk and up

27    against the residential fence.  Temores MAV recording, Sherman Decl. Ex. 14 at 10:10:20-26.

28

**United States District Court**
For the Northern District of California

Case No.: 09-CV-02655-LHK
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    Based on these facts, the question of whether Plaintiff's actions and the presence of the plastic soda

2    bottle gave rise to a reasonable concern for officer safety is matter of genuine factual dispute.

3          Moreover, it is not clear, based on the evidence presented, whether Plaintiff had actively

4    resisted the officers prior to being Tased.  At the preliminary examination in the criminal case,

5    Defendant Temores testified that up to the point when Defendant Burger deployed his Taser,

6    Plaintiff had not attempted to strike any of the officers or threatened to use physical force against

7    them.  Sherman Decl. Ex. 4 at 105:28-106:14.  Similarly, based on the MAV recording from

8    Defendant Temores' patrol car, it does not appear that Plaintiff attempted to use physical force

9    against any of the Defendants until Burger either shot him with Taser or at least had the Taser

10   pointed directly at him after pushing him against the residential fence.  *See* Sherman Decl. Ex. 14

11   at 10:10:20-30.  Accordingly, the extent to which Plaintiff posed an immediate safety threat and

12   was actively resisting or evading arrest is the subject of a material, factual dispute.  Drawing all

13   inferences in light of Plaintiff, however, a reasonable jury could find that the threat and resistance

14   posed by Plaintiff was slight in comparison to the significant, intermediate level of force employed

15   by Defendant Burger.  Based on this analysis, the Court finds that there is a genuine issue of

16   material fact as to whether Defendant Burger, supported by Defendants Temores and Wagner, used

17   objectively unreasonable force by deploying his Taser against Plaintiff in dart mode.

18         The Court agrees with Defendants, however, that they are entitled to qualified immunity on

19   the excessive force claim.  It is only recently that the Ninth Circuit has definitively determined the

20   level of force associated with Tasers deployed in dart mode.  *See Bryan*, 630 F.3d at 833

21   (describing "dearth of prior authority" on the use of tasers); *Mattos v. Agarano*, 590 F.3d 1082,

22   1089-90 (9th Cir. 2010) (describing absence of case law finding taser use unconstitutional);

23   *Brooks*, 599 F.3d at 1031 n.18 (describing shortage of cases regarding use of tasers in drive-stun

24   mode).  For this reason, in its recent Taser decisions, the Ninth Circuit has uniformly found that the

25   law surrounding tasers was not clearly established and concluded that the officers were entitled to

26   qualified immunity.  *See Bryan*, 630 F.3d at 833; *Mattos*, 590 F.3d 1082, 1089-90 (9th Cir. 2010);

27   *Brooks*, 599 F.3d at 1031 n.18.  However, these cases involved conduct that occurred between

28   2004 and 2006, whereas here the conduct occurred on March 15, 2008.  In making a qualified

25

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  immunity determination, the court must "consider the state of the law at the time of the alleged

2  violation." *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007).

3  　　　In determining whether the law was clearly established at any given time, courts within the

4  Ninth Circuit look first to the decisional authority of the Supreme Court and the Ninth Circuit.

5  *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004).  In the absence of binding precedent,

6  however, courts may "look to whatever decisional law is available to ascertain whether the law is

7  clearly established for qualified immunity purposes."  *Id.* (quotation marks and citations omitted).

8  The Ninth Circuit's decision in *Mattos* establishes that the law regarding Tasers was not clearly

9  established as of August 23, 2006, at least for cases in which the conduct alleged was not "so

10  patently violative of [the plaintiff's] constitutional rights that reasonable officials would know

11  without guidance from the courts that the action was unconstitutional."  *Mattos*, 590 F.3d at 1090.

12  Based on its review of district court decisions within this Circuit, the Court finds that by March

13  2008, it was clearly established that use of a Taser upon a suspect who had already been subdued

14  and arrested was objectively unreasonable and constituted excessive force.  *See Wakefield v. City of*

15  *Escondido*, Nos. 05-56769, 05-56809, 2007 WL 2141457, at *1 (9th Cir. July 26, 2007) (upholding

16  denial of qualified immunity where taser was deployed "repeatedly and without warning" against a

17  partially restrained, unarmed individual "who was in the throes of a claustrophobic attack, and who

18  pleaded with [the officer] not to shoot him"); *Richards v. Janis*, No. CV-06-3064-EFS., 2007 WL

19  3046252, at *4 (denying summary judgment where officer used taser on a suspect who "was

20  handcuffed, lying on the ground, already subject to substantial physical force from the other three

21  officers, and physically hurt").  In other circumstances, however, the case law was much less clear.

22  There are relatively few decisions that address Taser use in detail, and those that do vary in their

23  assessment of the quantum of force involved and reasonableness of applying that force to subdue

24  an unrestrained suspect.  *See, e.g.*, *Goldsmith v. Snohomish County*, 558 F. Supp. 2d 1140, 1150-51

25  (use of Taser to subdue suspect was reasonable); *McDonald v. Pon*, No. C05-1832JLR, 2007 WL

26  4420936 at *2 & n.7 (finding that Taser may cause superficial injuries and muscle fatigue, but

27  concluding that quantum of force applied is not severe); *Beaver v. City of Federal Way*, 507 F.

28  Supp. 2d 1137, 1144-46 (W.D. Wash. 2007) (finding that "use of a Taser constituted significant

26

**United States District Court**
For the Northern District of California

1  force" and concluding that continued use of Taser after a second officer arrived on the scene was

2  objectively unreasonable).  In *Bryan*, the Ninth Circuit granted qualified immunity in a case where

3  the officer shot his Taser, without warning, at an "unarmed, stationary individual, facing away

4  from an officer at a distance of fifteen to twenty-five feet" who had been stopped for not wearing

5  his seatbelt.  *Bryan*, 630 F.3d at 827-28, 831.  In this case, although Plaintiff was similarly

6  unarmed and stopped based on suspicion of a non-violent misdemeanor, he was located much

7  closer to the officers and was given some warning that he would be shot with a Taser if he did not

8  comply with the officers' orders.  The Court has not found that the law regarding Tasers was

9  significantly clarified between 2005, when the conduct in *Bryan* occurred, and March 15, 2008,

10  when the incident at issue in this case occurred.  *Bryan* thus appears to compel a finding of

11  qualified immunity in this case.  Accordingly, although the Court finds that triable issues of fact

12  exist regarding the reasonableness of deploying a Taser in dart mode against Plaintiff, the Court

13  concludes that Defendants are entitled to qualified immunity on this claim.  For this reason, the

14  Court GRANTS Defendants' motion for summary adjudication of this issue.

15  **b.  Use of Taser in Stun Drive Mode**

16  As to the second Taser deployment in stun-drive mode, the Court finds no evidence that this

17  use of force violated Plaintiff's constitutional rights.  As noted above, the Ninth Circuit has

18  concluded that the use of a Taser in drive-stun mode, as opposed to dart mode, constitutes a less

19  than intermediate level of force.  *Brooks*, 599 F.3d at 1028.  By the time that Defendant Temores

20  deployed his Taser in drive-stun mode, Plaintiff was actively resisting the officers by punching,

21  hitting, and kicking them.  *See* Temores MAV recording, Sherman Decl. Ex. 14 at 10:10:30-45.  It

22  is not until after Temores deploys his Taser that Plaintiff calms down and complies with the

23  officers' orders.  "Police officers are entitled to employ reasonable methods to protect themselves

24  and others in potentially dangerous situations." *Allen v. City of Los Angeles*, 66 F.3d at 1056.

25  Under the circumstances presented, it was objectively reasonable to use a less-than-intermediate

26  level of force to subdue Plaintiff and prevent him from injuring the officers.  Accordingly, the

27  Court GRANTS Defendants' motion for summary adjudication as to this issue.

28

### C.  Municipal and Supervisory Liability (Defendants City of Palo Alto, Johnson, Burns, and Powers)

In addition to his claims against Defendants Temores, Wagner, and Burger, who were all present during the March 15, 2008 incident, Plaintiff also brings his constitutional claims against the City of Palo Alto, former Palo Alto Chief of Police Lynn Johnson, current Palo Alto Chief of Police Dennis Burns, and Sergeant Natasha Powers.[11]  Plaintiff alleges that these Defendants permitted and tolerated a pattern and practice of unreasonable searches and seizures, excessive use of force, and obstruction of justice by police officers.  SAC ¶ 57.  He also claims that they have maintained an ineffective system for investigation and review of police conduct and have failed to take appropriate measures to prevent the pattern and practice of constitutional violations from continuing.  SAC ¶¶ 58-60.  Defendants argue that Plaintiff can produce no evidence in support of these allegations and move for summary judgment on that ground.

Under *Monell v. Department of Social Services of City of New York*, local governments are considered "persons" for purposes of Section 1983 and may be held liable for monetary damages in cases where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A local government may not be sued under a theory of respondeat superior for injuries inflicted solely by its employees or agents. *Monell*, 436 U.S. at 691; *Anderson v. Warner*, 451 F.3d 1063, 1070 (9th Cir. 2006). Rather, a plaintiff must demonstrate that the government's official policy or custom was the "moving force" responsible for infliction of her injuries. *Monell*, 436 U.S. at 694.  Under *Monell*, a plaintiff may establish municipal liability by demonstrating that "(1) the constitutional tort was the result of a longstanding practice or custom which constitutes the standard operating procedure of the local government entity; (2) the tortfeasor was an official whose acts fairly represent official policy such that the challenged action constituted official policy; or (3) an official with final policy-making authority delegated that authority to, or ratified the decision of, a subordinate." *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008).  In addition, a supervisor may be held liable under Section 1983 for

---

[11] Although the SAC indications that Plaintiff's § 1983 claims are brought against all Defendants, *see* SAC at p. 10, Defendant Dan Ryan is not named in this cause of action.

Case No.: 09-CV-02655-LHK
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

"1) their own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others." *Edgerly v. City and County of San Francisco*, 599 F.3d 946, 961 (9th Cir. 2010) (quoting *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000)).

In support of their motion for summary judgment, Defendants have submitted a declaration by current Chief of Police Dennis Burns stating that the City of Palo Alto Police Department has no policy, practice, or custom authorizing or condoning the use of excessive force, unlawful searches or seizures, or any other unlawful conduct alleged in Plaintiff's Second Amended Complaint. Sherman Decl. Ex. 19 ¶¶ 4, 7, 16. In his declaration, Burns also provides a description of the hiring, training, and review of police officers by the Palo Alto Police Department, as well as the procedure for review of citizens' complaints. *Id.* ¶¶ 8-11. He states, as well, that Plaintiff has made no attempt to take his deposition. *Id.* ¶ 3.

In its review of the evidence submitted by Plaintiff in support of his opposition brief, the Court has found no evidence suggesting that the City of Palo Alto maintains a policy, practice, or custom, written or otherwise, that could be considered the "moving force" behind Plaintiff's alleged injuries. *Monell*, 436 U.S. at 694. Nor has the Court identified evidence suggesting that Defendants Burns, Johnson, or Powers can be held liable for Plaintiff's injuries in their supervisory capacities. At the motion hearing, when the Court asked what evidence he had to establish a policy or practice on the part of the City, Plaintiff identified the Use of Force Report prepared by Defendant Powers, which describes the March 15, 2008 incident. *See* Ciampi Decl. Ex. 503-11. This one-page description of the incident does not suggest that the City had a policy or practice that caused Plaintiff's injuries, nor does it suggest any culpability on the part of Defendant Powers. Accordingly, the Court agrees with Defendants that there is no evidence in the record to support Plaintiff's § 1983 claims for municipal or supervisory liability. The Court therefore GRANTS Defendant's motion for summary adjudication of the § 1983 claims against Defendants City of Palo Alto, Johnson, Burns, and Powers.

Case No.: 09-CV-02655-LHK
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## V.  State Law Claims

In addition to his federal § 1983 claims, Plaintiff has asserted a number of state law claims against the Defendants in this action.  The Court will consider each of Plaintiff's state law claims in turn.

### A.  Assault and Battery (against Defendants Temores, Burger, Wagner, and the City)

Plaintiff's second cause of action alleges a claim of assault and battery against Defendants Temores, Burger, Wagner, and the City of Palo Alto.  Under California law, law enforcement officers are explicitly permitted to use reasonable force to effect an arrest, prevent escape, or overcome the resistance of a person being arrested.  Cal. Penal Code § 835a.  Accordingly, a law enforcement officer who uses force in the course of an arrest is not liable for battery unless the plaintiff proves that the force used was unreasonable.  *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272-73, 74 Cal. Rptr. 2d 614 (Cal. Ct. App. 1998).  For this reason, battery claims brought under California law are analyzed under the reasonableness standard used to evaluate Fourth Amendment claims and require the same evidentiary showing.  *See id.* at 1274; *Susag v. City of Lake Forest*, 94 Cal. App. 4th 1401, 1413, 115 Cal. Rptr. 2d 269 (Cal. Ct. App. 2002); *Saman v. Robbins*, 173 F.3d 1150, 1156-57 & n.6 (9th Cir. 1999).  Thus, the analysis of Plaintiff's Section 1983 claim applies equally to Plaintiff's claim for assault and battery.  The Court has found that a genuine issue of material fact exists regarding whether Defendants Burger, Temores, and Wagner used reasonable force in detaining Plaintiff.  Although qualified immunity bars Plaintiff's federal claim for excessive force, it does not bar his state law claim for battery.  *See Robinson v. Solano County*, 278 F.3d 1007, 1016 (9th Cir. 2002) ("California denies immunity to police officers who use excessive force in arresting a suspect.").  Additionally, because the City of Palo Alto is liable for the acts or omissions of its employees if those acts or omissions would have given rise to a cause of action against that employee, Cal. Gov't Code § 815.2(a), there is also a genuine issue of material fact regarding the City's liability. Accordingly, the Court DENIES Defendants' motion for summary adjudication of Plaintiff's battery claim.

Case No.: 09-CV-02655-LHK
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### B.  Intentional Infliction of Emotional Distress

Plaintiff's third cause of action asserts a claim of intentional infliction of emotional distress ("IIED") against all Defendants.  To prevail upon an IIED claim under California law, Plaintiff must show (1) outrageous conduct by the defendants; (2) an intention to cause, or reckless disregard of the probability of causing, emotional distress; (3) severe emotional suffering; and (4) actual and proximate causation of the emotional distress.  *Wong v. Tai Jing*, 189 Cal. App. 4th 1354, 1376, 117 Cal. Rptr. 3d 747 (Cal. Ct. App. 2010).  A defendant's conduct is "outrageous" when it is "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Hughes v. Pair*, 46 Cal. 4th 1035, 1050-51, 209 P.3d 963 (2009) (quotation marks and citation omitted).

Plaintiff's IIED claim appears to be based upon Defendants' alleged use of excessive force, malicious prosecution, and defamation of Plaintiff.[12]  *See* SAC ¶ 72 (describing suffering associated with Defendants' use of force, injury to Plaintiff's reputation, and fear of being maliciously prosecuted); Ciampi Decl. ¶¶ 83-84 (describing "unbearable" stress, anxiety, and chest pains due to allegedly falsified videos); *id.* ¶ 92 ("I live in perpetual fear of being falsely incriminated by the Defendants").  Defendants argue that because their conduct was lawful, it was not outrageous as a matter of law.  In particular, they argue that because the use of reasonable force is privileged under California Penal Code § 835a, Defendants cannot be held liable for any infliction of emotional distress arising out of their use of reasonable force.

Conduct that is privileged may not form the basis for an IIED claim.  *Ross v. Creel Printing & Publishing Co.*, 100 Cal. App. 4th 736, 745, 122 Cal. Rptr. 2d 787 (Cal. Ct. App. 2002).  The Court concludes below that Defendants are entitled to immunity on Plaintiff's claims of defamation and malicious prosecution.  Thus, the allegations related to these claims cannot serve as a basis for Plaintiff's IIED claim.  However, as discussed above, the Court has found that a genuine issue of material fact exists regarding whether Defendants Burger, Temores, and Wagner used reasonable

---

[12] In his opposition brief and declaration, Plaintiff also claims that he suffered severe emotional distress when Interim City Attorney Don Larkin showed the allegedly falsified MAV video to the media.  However, Mr. Larkin is not a defendant in this action, and the SAC contains no allegations regarding public showings of the videos.

Case No.: 09-CV-02655-LHK
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

force in detaining Plaintiff.  Accordingly, there remain triable issues of fact regarding whether their conduct was lawful or privileged under California law, and whether the use of force may serve as the basis for Plaintiff's IIED claim.  *See Blankenhorn v. City of Orange*, 485 F.3d 463, 487 n.17 (9th Cir. 2007) (reversing grant of summary judgment on IIED claim because excessive use of force could constitute outrageous conduct).  Aside from arguing that their conduct was lawful and privileged, which cannot be established on this motion, Defendants have offered no other grounds for summary adjudication of Plaintiff's IIED claim.  For these reasons, the Court must DENY summary adjudication of this claim as to Defendants Temores, Wagner, Burger, and the City of Palo Alto.  The motion is GRANTED as to the remaining Defendants.

### C. Negligence

Plaintiff's Fourth Cause of Action alleges that Defendants Temores, Wagner, and Burger breached a duty to Plaintiff to perform their police duties without unreasonable searches and seizures and without excessive force.  SAC ¶ 76-78.  Plaintiff also alleges that the City of Palo Alto breached a duty to adequately train, supervise, and control its employees.  SAC ¶ 82.  Defendants argue that this claim fails as a matter of law because the officers acted reasonably and without excessive force.  As previously indicated, however, the Court has found triable issues of fact regarding whether Defendants Temores, Wagner and Burger used excessive force.  Thus, the Court cannot grant summary adjudication on that ground.

Defendants also argue that they would be immune from liability pursuant to California Government Code § 820.2, which provides that a public employee is not liable for an injury arising from an act or omission that "was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."  The scope of immunity under § 820.2 is somewhat limited, however.  California case law establishes that "not all acts requiring a public employee to choose among alternatives entail the use of 'discretion' within the meaning of section 820.2."  *Barner v. Leeds*, 24 Cal. 4th 676, 684-85, 102 Cal. Rptr. 2d 97 (2000).  In analyzing the discretionary immunity conferred by § 820.2, the California Supreme Court has drawn a distinction between policy decisions, which are immunized, and ministerial or operational decisions, which are not.  In *Caldwell v. Montoya*, the California Supreme Court explained that immunity is reserved for areas

32

of quasi-legislative policy-making and applies only to "*deliberate and considered* policy decisions, in which a [conscious] balancing [of] risks and advantages . . . took place." 10 Cal. 4th 972, 981, 42 Cal. Rptr. 2d 842 (1995) (quotation makes and citation omitted).

In contrast, day-to-day operational decisions are not immunized by § 820.2, even if they require "exercise of considerable judgmental skills." *Barner*, 24 Cal. 4th at 686-87.  Thus, while a public defender's initial decision to represent a particular defendant may be a discretionary decision immunized by § 820.2, the decisions made and actions undertaken during the course of the representation are not immunized, even though "such legal representation entails difficult choices among complex alternatives and the exercise of professional skill." *Id.* at 688, 691. Similarly, while a police officer's initial decision to investigate a car accident may constitute a discretionary decision immunized by § 820.2, the officer is not immunized from any negligence in *conducting* the investigation.  *McCorkle v. City of Los Angeles*, 70 Cal. 2d 252, 261-262 74 Cal. Rptr. 389 (1969).

Based on these cases, it would seem that the officers' original decision to follow up on Mr. Alsman's 911 call and make contact with Plaintiff might constitute acts of discretion immunized by § 820.2.  However, the decisions made and actions taken during the conduct of their contact with and arrest of Plaintiff would not be immunized.  *See Liberal v. Estrada*, 632 F.3d 1064, 1084 (9th Cir. 2011) ("As a matter of law, section 820.2 immunity does not apply to an officer's decision to detain or arrest a suspect.").  Accordingly, Defendants are not entitled to summary adjudication on the basis of state law immunities.  Because the Court has found triable issues of fact regarding the reasonableness of the force used by Defendants Temores, Wagner, and Burger, Defendants' motion for summary adjudication of Plaintiff's negligence claim against these Defendants and the City must be denied.

### D.  Defamation (against Defendants Burns, Johnson, Ryan, Temores, and the City)

Plaintiff's fifth cause of action asserts a claim of defamation against Defendants Burns, Johnson, Ryan, Temores, and the City of Palo Alto.  The SAC alleges that Defendants made defamatory statements including (1) that Plaintiff leered at a wife and young children; (2) that Plaintiff had scared a wife and her daughter and made them feel uncomfortable by the way he

33

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

watched them; and (3) that Plaintiff was a drug addict.  SAC ¶ 85.  Plaintiff claims that Defendants Burns and Johnson published these statements in May to July 2008 in the Palo Alto City Council Report, the Palo Alto Daily news, and elsewhere.  SAC ¶¶ 86-87.  Plaintiff also claims that Defendants Ryan and Temores published such statements in December 2008 in the Palo Alto Daily News and the Palo Alto Online News.  SAC ¶¶ 88-89.  In response to discovery requests, Plaintiff also identified similar statements made in police reports and in Plaintiff's criminal court proceeding.

Defendants do not dispute that some of the alleged statements may have been false.  Mr. Alsman did not state on the 911 call that Plaintiff leered or looked at his wife and daughter in a way that made them uncomfortable, *see* Sherman Decl. Ex. 18 (recording of 911 call), and no evidence has been presented suggesting that Plaintiff has a drug addiction.  Defendants argue, however, that they are immune from liability under California Government Code § 821.6.  The Court agrees.

Pursuant to § 821.6, "[a] public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause."  California courts construe this provision broadly "in furtherance of its purpose to protect public employees in the performance of their prosecutorial duties from the threat of harassment through civil suits."  *Gillan v. City of San Marino*, 147 Cal. App. 4th 1033, 1048, 55 Cal. Rptr. 3d 158 (2007).  Accordingly, § 821.6 has been held to immunize actions taken in preparation for formal judicial proceedings, as well as the actual institution and prosecution of such proceedings.  *Id.*  "Acts undertaken in the course of an investigation, including press releases reporting the progress or results of the investigation," are considered preparation for formal proceedings and are therefore encompassed by § 821.6 immunity.  *Id.*  However, immunity may also extend to statements made after a conviction is obtained and prosecution has ended.  *See Cappuccio, Inc. v. Harmon*, 208 Cal. App. 3d 1496, 1500, 257 Cal. Rptr. 4 (Cal. Ct. App. 1989).  "[T]he test of immunity is not the timing of the publication but whether there is a causal relationship between the publication and the prosecution process.  If the making and publication of the statements were part of the process, they [are]

34

1    protected by the immunity in section 821.6." *Ingram v. Flippo*, 74 Cal. App. 4th 1280, 1292-93,

2    89 Cal. Rptr. 2d 60 (Cal. Ct. App. 1999).  Immunity under § 821.6 is not limited to claims for

3    malicious prosecution, but also extends to other causes of action arising from conduct protected

4    under the statute, including defamation.  *Gillan*, 147 Cal. App. 4th at 1048.

5           Here, Plaintiff claims that Defendants made defamatory statements in the months prior to

6    his criminal proceeding, during his criminal proceeding, and soon thereafter.  *See* SAC ¶¶ 86-89;

7    Ciampi Decl. Ex. 321-2 – 322-10.  It appears that the media publications to which Plaintiff refers

8    quoted the Defendants' statements from official police reports and testimony in the judicial

9    proceeding.  *See, e.g., id.* Ex. 321-6, 321-9, 321-10, 321-11.  Such statements form part of the

10   preparation and prosecution of the judicial proceedings against Plaintiff and are therefore covered

11   by § 821.6.  In addition, Defendant Ryan's statements were made in response to the dismissal of

12   Plaintiff's criminal case.  *See id.* Ex. 321-12.  California courts have ruled that public statements

13   made to report on the outcome of a prosecution are also part of the prosecution process and come

14   within the scope of § 821.6.  *Cappuccio*, 208 Cal. App. 3d at 1500.  Accordingly, the Court agrees

15   that § 821.6 grants Defendants immunity from Plaintiff's defamation claim and GRANTS

16   summary adjudication on this issue in favor of Defendants.

17                    **E.  Malicious Prosecution**

18          Plaintiff's sixth cause of action asserts a claim of malicious prosecution against all

19   Defendants.  As Defendants point out, however, California Government Code § 821.6 grants public

20   employees immunity from malicious prosecution claims.  *See* Cal. Gov't Code § 821.6 ("A public

21   employee is not liable for injury caused by his instituting or prosecuting any judicial or

22   administrative proceeding within the scope of his employment, even if he acts maliciously and

23   without probable cause."); *see also Asgari v. City of Los Angeles*, 15 Cal. 4th 744, 752, 63 Cal.

24   Rptr. 2d 842 (1997) ("Under California law, a police officer is granted statutory immunity from

25   liability for malicious prosecution . . . .").  "The immunity applies even if the officers abused their

26   authority," *County of Los Angeles v. Superior Court*, 181 Cal. App. 4th 218, 229, 104 Cal. Rptr. 3d

27   230 (Cal. Ct. App. 2009), and extends to claims that the police suppressed evidence.  *Randle v.*

28   *City and County of San Francisco*, 186 Cal. App. 3d 449, 456-57, 230 Cal. Rptr. 901 (Cal. Ct. App.

Case No.: 09-CV-02655-LHK
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   1986).  Pursuant to § 821.6, Defendants are immune from liability on Plaintiff's malicious

2   prosecution claim.  Accordingly, the Court GRANTS summary adjudication of this claim.

### F.  False Arrest and False Imprisonment (against Defendants Temores, Burger, Wagner, and the City)

5       Plaintiff's final cause of action asserts a claim for false arrest and false imprisonment

6   against Defendants Temores, Burger, Wagner, and the City of Palo Alto.  Under California law, the

7   elements of false imprisonment are "(1) the nonconsensual, intentional confinement of a person,

8   (2) without lawful privilege, and (3) for an appreciable period of time, however brief." *Lyons v.*

9   *Fire Ins. Exchange*, 161 Cal. App. 4th 880, 888, 74 Cal. Rptr. 3d 649 (Cal. Ct. App. 2008) (quoting

10  *Easton v. Sutter Coast Hospital*, 80 Cal. App. 4th 485, 496, 95 Cal. Rptr. 2d 316 (Cal. Ct. App.

11  2000)).  "In California, false arrest is a species of the tort of false imprisonment." *Blankenhorn v.*

12  *City of Orange*, 485 F.3d 463, 486 n.15 (9th Cir. 2007).  "A person is falsely imprisoned 'if he is

13  wrongfully deprived of his freedom to leave a particular place by the conduct of another.'"

14  *Hagberg v. California Federal Bank FSB*, 32 Cal. 4th 350, 373, 81 P.3d 244 (2004) (quoting

15  *Molko v. Holy Spirit Assn.*,  46 Cal. 3d 1092, 1123, 252 Cal. Rptr. 122, 762 P.2d 46 (1988)).  In his

16  opposition brief, Plaintiff argues that Defendants are liable for false imprisonment or arrest because

17  they lacked articulable facts to detain Plaintiff.  However, the Court has found that Defendants had

18  a reasonable, articulable suspicion that justified their detention of Plaintiff, and that officer safety

19  concerns justified subsequent use of the Taser in drive-stun mode to subdue and restrain Plaintiff.

20  Accordingly, Plaintiff's arguments do not establish a claim for false imprisonment, and the Court

21  GRANTS Defendants' motion for summary adjudication of this claim.

### VI.  Plaintiff's Motions for Reconsideration

23      Finally, the Court notes that on April 21, 2011, Plaintiff filed a motion styled as a motion

24  for leave to file a motion for reconsideration.  *See* Mot. for Leave to File a Mot. for

25  Reconsideration, ECF No. 146.  Subsequently, on April 25, 2011, Plaintiff filed a supplement to

26  the April 21 motion.  *See* Supplement to Mot. for Leave to File a Mot. for Reconsideration, ECF

27  No. 148.  Through these motions, Plaintiff seeks to supplement his briefing in opposition to the

28  motion for summary judgment with case law of which he was unaware when his opposition brief

Case No.: 09-CV-02655-LHK
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

was due.  The Court has reviewed Plaintiff's motions and found that nothing contained therein would change the reasoning or outcome of this Order.  Additionally, Plaintiff's motions are untimely and procedurally improper.  *See* Civ. L.R. 7-3(d) (governing supplemental material filed after a reply); Civ. L.R. 7-9 (governing motions for reconsideration of an interlocutory order).  Accordingly, the Court DENIES Plaintiff's request for leave to file the proposed motions for reconsideration.

**VII.    Conclusion**

For the reasons discussed above, the Court GRANTS in part and DENIES in part Defendants' motion for summary judgment.  The Court GRANTS summary adjudication in favor of Defendants on the following claims: (1) first cause of action under 42 U.S.C. § 1983; (2) fifth cause of action for defamation; (3) sixth cause of action for malicious prosecution; and (4) seventh cause of action for false imprisonment and false arrest.  The Court DENIES summary adjudication on the following claims: (2) second cause of action for assault and battery; (3) third cause of action for intentional infliction of emotional distress; and (4) fourth cause of action for negligence.

**IT IS SO ORDERED.**

Dated: May 11, 2011

_____

LUCY H. KOH
United States District Judge

United States District Court
For the Northern District of California